455 P.2d 634 (1969)
The STATE of MONTANA, Plaintiff and Appellant,
v.
Harold Dean WILLIAMS, Defendant and Respondent.
No. 11648.
Supreme Court of Montana.
Submitted April 17, 1969.
Decided June 11, 1969.
Rehearing Denied July 8, 1969.
*635 Robert L. Woodahl, Atty. Gen., Douglas Wold, Asst. Atty. Gen., argued, Helena, Clayton Jones, Jr., appeared, Miles City, for appellant.
Colgrove & Brown, Bruce M. Brown, argued, Miles City, for respondent.
CASTLES, Justice.
Defendant was charged with the crime of first degree murder in the district court of Custer county. He entered a plea of "not guilty" and thereafter prior to trial, moved to suppress the use in evidence at his trial of a rifle alleged to be the murder weapon. From an order of the district court granting defendant's motion to suppress, the state appeals.
The sole issue on this appeal is whether the rifle is rendered inadmissible in evidence as the product of an unlawful search and seizure in violation of United States constitutional guarantees. The district court held the rifle inadmissible on this basis.
The material facts in this case are essentially undisputed. About 1:30 a.m. on November 23, 1968 Janet Smith was shot and killed at the Alta Club located east of Miles City. The sheriff was notified and arrived at the Alta Club about 15 minutes later. During the course of his investigation there, he obtained information which led him to *636 believe that Harold Dean Williams, the defendant herein, had committed the homicide.
About 45 minutes after the shooting, Williams entered the Miles City police station. The only person there at the time was Lt. Alton B. Cain of the Miles City police. Without Cain having said anything, Williams volunteered the information that he "just shot somebody". Cain asked "where?" and Williams replied "at the Alta Club". Cain then asked what Williams had done with the gun. Williams replied "I left it at home."
At this point Williams left the room to use the bathroom. Upon his return Williams sat down in the room with Lt. Cain to make some telephone calls. Williams called Mr. Roland Colgrove, a Miles City attorney, but was unsuccessful in reaching him. Williams then called another attorney; then called his wife.
In the meantime Lt. Cain had radioed the sheriff informing him of Williams' presence at the police station. The sheriff then proceeded to the police station. At the time he entered the police station the sheriff considered Williams a suspect in the homicide and immediately thereafter became aware that Williams wanted counsel as Williams had called two lawyers. Williams was not advised at this time as to any of his constitutional rights.
When the sheriff arrived at the police station the defendant was speaking on the telephone to his wife. Williams asked the sheriff "How is she?" and the sheriff replied "She is dead". This message was relayed by Williams to his wife. The sheriff then asked either Lt. Cain or Williams where the gun was and Williams informed him that it was down at his house. The sheriff said "I would like to pick the rifle up." Williams asked the sheriff what they were going to do with him and the sheriff told him they were going to hold him. Williams inquired "Do I need a lawyer?" and the sheriff said "yes", "better get one" or words to that effect. The sheriff's testimony is as follows:
"Q. So as I understand the facts then, you suspected that he was the one who may have shot the girl, is that correct? A. That's right.
"Q. You went into the police station, and you were going to hold him in custody, is that correct? A. We were going to question him or talk to him and see what 
"Q. And at the time you knew that he wanted a lawyer because he was calling a lawyer? A. Yes, he called a couple of them.
"Q. Because he was wanting counsel and was unsuccessful in obtaining it. Then he asked you what were you going to do with him, is that correct? A. Yes.
"Q. I'm going to hold you. A. Yes.
"Q. Then he said, `Do I need a lawyer', and you said, `Yes'. Is that correct, or `Better get one', or words to that effect? A. Yes.
"Q. It was after this that he then said, `Let's go down and get the rifle'? A. Yes.
"Q. And you had previously asked him that you wanted the rifle? A. I would like to pick it up, yes.
"Q. Now when you knew that he was trying to get an attorney, did you tell him that the state would provide him with one? A. No, sir.
"Q. Did you tell him that he didn't have to talk to you about the rifle or anything else? A. No, sir.
"Q. Did you tell him that he didn't have to give you the rifle unless you had a valid search warrant? A. I didn't tell him he had to.
"Q. Did you tell him he could just remain silent? A. No, sir.
"Q. Did you tell him that if he did say where the rifle was, and if he did say you could go down and get it that that evidence could be used against him in this trial? A. No, sir.
"Q. And he was in custody wanting a lawyer at that time, because he couldn't get one could he? A. He called a couple, I don't know whether he had got them or not.
*637 "MR. BROWN: That is all."
Williams left the room to get a drink from a fountain in the hallway and the sheriff followed him. Williams said "You don't have to follow me, I came in on my own." Thereafter Williams said "Let's go down to the house and get the gun."
The sheriff and Williams went to the latter's house in Miles City. When they arrived there the sheriff and Williams entered the house, went to a bedroom, Williams went to a closet, took out the rifle and handed it to the sheriff. The sheriff inquired as to the location of the empty cartridge and Williams advised him that he had thrown it up into the closet. They did not find the empty cartridge that night.
They returned to the sheriff's office with the rifle. At this time Williams was given what was described as the "Miranda warning" of his constitutional rights by a deputy sheriff. Williams remained in custody thereafter.
Subsequently Williams was charged with first degree murder by information filed directly in the district court. A court appointed attorney was named to represent him. Following Williams' arraignment and plea of "not guilty", he filed a written motion to suppress the use of the rifle as evidence against him and requested it be returned to him.
An evidentiary hearing was held on defendant's motion. Thereafter the district court, the Hon. Alfred B. Coate, district judge presiding, entered findings of fact, conclusions of law, and an order granting defendant's motion. The basis of the district court's ruling was that the defendant did not waive his constitutional right to a lawful search and seizure of the rifle by consenting to its "search and seizure" under the facts of the case. Hence the search and seizure of the rifle was unreasonable and unlawful rendering its product, the rifle, inadmissible in evidence.
The single underlying issue presented by this appeal is whether the rifle was obtained by an unlawful search and seizure in violation of the 4th and 14th Amendments to the United States Constitution. The state divides this basic issue into two parts which can be summarized in the following language: (1) Was the rifle secured as the result of a "search"? and (2) If so, was the search unlawful?
Broadly speaking, this appeal involves immunities granted in the United States Constitution to persons accused of crime. Specifically involved herein is the 4th Amendment guarantee against "unreasonable searches and seizures" of an accused's property from his home without a search warrant. This guarantee is applicable to state court criminal proceedings under the "due process" clause of the 14th Amendment preventing use therein of evidence secured as the result of an unreasonable search and seizure. Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.
The state contends that the foregoing United States constitutional guarantees are not applicable to the instant case because there was no "search" of any kind. The state points out that the defendant himself suggested they go to his home and get the rifle; defendant himself went there and got the rifle from his closet and immediately turned the rifle over to the sheriff who accompanied him. The state argues this was simply a voluntary production and surrender of the rifle by the defendant and no "search" by the sheriff was involved.
The defendant, respondent here, argues there was a "search" and "seizure" and there was no valid consent thus making it an unlawful search. Respondent argues that we must look to the Federal decisions. We agree. He argues that under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, once the defendant indicated he wanted to consult an attorney, as the sheriff knew, all questioning and activity must cease, even though the defendant voluntered to get the gun. Thus, defendant reasons, if you carry it out to the end, all evidence volunteered by himself can be forever deprived to the state in its search for the truth and justice.
*638 In the Code of Criminal Procedure adopted by the 40th Legislative Assembly of Montana in 1967, effective January 1, 1968, section 95-701 provides:
"A search of a person, object or place may be made and instruments, articles or things may be seized * * * when the search is made: * * * (b) With the consent of the accused * * * who is lawfully in possession of the object or place to be searched, * * *."
The comment of the Criminal Law Commission of Montana published with the code section states:
"This is new and has no counterpart in present Montana sections or codes of other states. It is intended to state the law as to when searches and seizures are authorized and codifies the present law as laid down by state and federal decisions. It is the law in Montana and under the federal decisions that a search and seizure may be made without a warrant as an incident to a lawful arrest or where the individual freely and intelligently gives his unequivocal and specific consent to search, uncontaminated by any express or implied duress. State v. Tomich, 332 F.2d 987 (9th Cir.). Also see: State v. Nelson, 130 Mont. 466, 304 P.2d 1110." (Emphasis ours)
The foregoing underlined part of the comment states the rule we believe to be the proper rule. Under the facts in this case, the defendant freely and intelligently gave his unequivocal and specific consent to the search, uncontaminated by any express or implied duress.
First let us examine whether there was a search as that term is used in the 4th Amendment to the Constitution of the United States. That the term "search" is considerably broader of recent times by reason of decisions of the federal courts is an understatement.
Some examples of activities prohibited by the "search and seizure" provisions of the 4th Amendment which do not conform to any narrow or literal definition of a "search" are: taking blood samples for use in testing procedures for intoxication (Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908); fingerprinting during illegal detention by police (Davis v. Mississippi, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676); electronic listening and recording from outside a public telephone booth of statements made into the telephone (Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576); peeking through the window of a house and observing occurrences therein (State of Texas v. Gonzales, CCA 5, 388 F.2d 145); interception of messages by wiretapping (Lee v. Florida, 392 U.S. 378, 88 S.Ct. 2096, 20 L.Ed.2d 1166); squeezing luggage to detect presence of narcotics (Hernandez v. United States, CCA 9, 353 F.2d 624).
Plunging directly into the federal constitutional thicket we find that a "search" has been held to imply an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action; it implies an exploratory investigation or quest. Haerr v. United States, CCA 5, 240 F.2d 533, cited and applied in United Staes v. Pate, CCA 7, 324 F.2d 934 and United States v. Blackburn, CCA 6, 389 F.2d 93; 79 C.J.S. Searches and Seizures § 1, page 775. In the aggregate, a "search" in its 4th Amendment sense simply denotes (1) a quest by an officer of the law (Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652) (2) with an intention to find (United States v. Lodahl, D.C.Mont., 264 F. Supp. 927), (3) which invades a constitutionally protected area (Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399; Weeks v. United States, supra).
But, under the foregoing "criteria", the sheriff was merely the receiver of a voluntarily surrendered object. It was just as if the defendant surrendered himself and his gun simultaneously. He was seeking out the protection of the law or voluntarily accepting its responsibility. Certainly he was, at that point, voluntarily submitting to arrest and the consequences.
*639 A recent decision of the United States Supreme Court in Orozco v. State of Texas, rendered March 25, 1969, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311, is somewhat in point, at least for the distinction of what we have described as a free, intelligent, unequivocal and specific consent, uncontaminated by any express or implied duress. While the Orozco case turned on the 5th Amendment, the principles are analogous in determining whether there was "compulsion" or a lack of duress, express or implied. In the Orozco case, four police officers went to the suspect's rooming house, uninvited and found him in bed. They "invaded", as it were, unannounced, uninvited, and in force. Failing to give the Miranda warning rendered the incriminating statements concerning the location of the defendant at the scene of the crime and the location of the weapon inadmissible under the 5th Amendment.
However, here we have just the opposite, the suspect sought out the police officers before Lt. Cain even knew a homicide had been committed, or whether there was any crime at all, volunteered the information and almost simultaneously volunteered to get the weapon and did so. There simply was no "compulsion" and a total lack of duress, even implied. Unless we were to suddenly find knowledge on the part of law enforcement officers a transmittal of "implied duress" by some unknown media, defendant was a free, intelligent volunteer and knowingly surrendered himself and his weapon. Even Justice Black writing for the majority in Orozco stresses that the Miranda decision is not expanded or extended in the slightest by Orozco.
It is argued in the instant case that a person waives his constitutional immunity against an unlawful search and seizure by voluntarily consenting to it, but that in determining whether the waiver is voluntary, the lack of a Miranda warning is proof positive that the consent was not a "knowing" one. In the instant case the trial court's findings were in the following language:
"The defendant did not waive his constitutional right to a lawful search and seizure of his home, because consent can only be given after it is shown:
"1. That defendant had an understanding of his constitutional rights;
"2. That the waiver was uncoerced;
"3. That defendant had the express knowledge that he could withhold his consent. (Schoepflin v. United States [9 Cir.] 391 F.2d 390)."
We have already determined that there was no "search" as such, but have assumed that there was a "search" in analyzing whether that search was "unlawful". We have found that the search was lawful. Now we find ourselves "shadow-boxing" in an effort to apply the criteria of Schoepflin to determine whether the defendant knew that he could withhold his consent. We ask, what consent? None was necessary because here he was volunteering the surrender of the rifle as well as himself. To say that this involves a "knowing consent" is to defy his standing presence. Somewhere involved in defendant Williams' thought process when he made his way to the police stataion, consent to place one foot in front of the other in the direction of the law must have occurred.
In another recent United States Supreme Court decision, Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684, Mr. Justice Marshall writing for an unanimous court in discussing both the assertion that a statement about seeing or needing a lawyer and a consent to search while making an arrest dismissed both rather summarily. The alleged request for an attorney was considered a passing remark and not covered by the rule of Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; although it was said that Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, might have been applicable to have required the police to stop further questioning until counsel was obtained. However, even that dictum would not cover the facts in the instant case which *640 we have shown to have occurred in the manner above.
We conclude that the district court was in error in granting the motion to suppress the evidence and thus the order is set aside.
JAMES T. HARRISON, C.J., concurs.
JOHN C. HARRISON, Justice (specially concurring).
I concur with the majority opinion and comment further: The provisions of the 4th Amendment had their origin as a safeguard against high handed and ruthless intrusions by officials of an oppressive government against persons, homes and property. No right-thinking person would minimize or disparage these protections. It is equally important that these protections be applied in circumstances where they were intended; that they not be so extended beyond their reasons for being that even where there is no danger or likelihood of such abuse they give a cloak of protection by which those engaged in criminal activities may escape detention and punishment. The essential criterion is to keep on a reasonable middle ground  between protecting the law abiding citizenry from high handed or officious intrusions into their private affairs and the imposing of undue restrictions upon conscientious officers doing their duty in investigation of crime. On this basis I would find nothing unreasonable in the sheriff's action in going with the defendant to his home and getting the weapon.
HASWELL and BONNER, Justices (dissenting).
We dissent. In our view, federal court decisions concerning waiver of fundamental United States constitutional guarantees compel this result.
The majority conclude that no unlawful search and seizure occurred here, but only a voluntary production and surrender of the rifle by the defendant. We believe this conclusion is directly contrary to controlling federal precedent.
A search within the meaning of the "search and seizure" provisions of the 4th Amendment to the United States Constitution occurred in the instant case under the federal standards and authorities cited in the majority opinion. The sheriff sought to obtain the rifle and so informed the defendant (a quest by an officer of the law); the sheriff went with the defendant to his house with the intention of finding the rifle in some undisclosed location therein (an intention to find); and the rifle was in fact found in a bedroom closet in the defendant's house (an invasion of a constitutionally protected area). The fact that the defendant himself procured the rifle from the closet and handed it over to the sheriff constitutes no less a search than if the sheriff himself had entered the closet and extracted the rifle. United States v. Butler, D.C.Texas, 223 F. Supp. 24.
Any search and seizure of a person's property from his habitation without a search warrant is unlawful under the "search and seizure" provisions of the 4th Amendment to the United States Constitution, subject to certain specifically established and well defined exceptions. Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59. The only possible exception applicable in the instant case concerns a waiver of defendant's constitutional immunity against an unlawful search and seizure by voluntarily consenting to it.
Here the district court held, in effect, that there was no valid waiver because (1) defendant did not understand his constitutional rights, (2) the waiver was coerced, and (3) the defendant did not know he could withhold his consent. In our view this holding is correct, both from a legal and from an evidentiary standpoint.
A waiver of a fundamental constitutional right is an intentional relinquishment or abandonment of a known right or privilege. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. The burden of proving waiver by consent to an otherwise unlawful search and seizure is upon the prosecution. State of Montana v. Tomich, CCA *641 9, 332 F.2d 987. A verbal expression of assent is not conclusive as to waiver, but all circumstances must be considered in determining whether there has been a valid waiver. Cipres v. United States, CCA 9, 343 F.2d 95. As expressed by the United States Court of Appeals in Cipres:
"Waiver, in this context, means the `intentional relinquishment of a known right or privilege.' (Citing authority) Such a waiver cannot be conclusively presumed from a verbal expression of assent. The court must determine from all the circumstances whether the verbal assent reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld. We recently sustained a district court finding that such waiver was lacking despite an express verbal consent, and such cases are common. They rest not only upon the nature of waiver itself, but also upon a recognition that the purpose of the exclusionary rule is not only to discourage overreaching by police officers, but also, and primarily, to protect the rights of the citizen. The crucial question is whether the citizen truly consented to the search, not whether it was reasonable for the officers to suppose that he did." (Emphasis supplied.)
Additionally, in order to constitute a valid waiver under the "search and seizure" provisions of the 4th Amendment, the person consenting must know that such consent may be freely and effectively withheld. Schoepflin v. United States, CCA 9, 391 F.2d 390. In our view the foregoing constitutes the controlling federal law applicable to this case.
Directing our attention next to the evidence we find a total absence of evidence that the defendant knew of his constitutional rights concerning search and seizure or self-incrimination. All the evidence from the prosecution's own witnesses indicates that the defendant was not given the "Miranda warning" or any other advice or protection of such constitutional rights until the rifle was safely in the custody of the sheriff. In this respect alone the prosecution has failed in its burden of proof of a valid waiver by defendant under the authority previously cited.
But there is more in the record than this. The uncontradicted evidence shows that the defendant did not bring the rifle into the police station and voluntarily surrender it when he submitted himself to custody. If that were the case, no problem would be presented here. That situation is in no way analogous to the instant case. To suggest that by submitting himself to custody, defendant waived his constitutional right to a lawful search and seizure of the rifle from his home finds no support in any adjudicated case of which we are aware.
What is the situation in the instant case? The rifle the sheriff sought was in a closet in the defendant's home. He did not offer to surrender it to the sheriff (1) until the sheriff requested the defendant to surrender it, (2) after he was in custody, (3) in a police dominated atmosphere, (4) without friends or legal counsel, and (5) without knowledge that he could effectively withhold his consent.
In our view the foregoing evidentiary circumstances, although not conclusive, constitute substantial, credible evidence on which the district court bottomed its decision under the controlling federal authority of Schoepflin, supra. No "shadow-boxing" is involved in reaching this result, but simply the application of controlling federal constitutional criteria.
For the foregoing reasons, we would affirm the decision of the district court.