# FILED

12/18/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0575



DA 23-0575

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 312

RIKKI HELD; LANDER B., by and through his guardian Sara Busse; BADGE B., by and through his guardian Sara Busse; SARIEL SANDOVAL; KIAN T., by and through his guardian Todd Tanner; GEORGIANNA FISCHER; KATHRYN GRACE GIBSON-SNYDER; EVA L., by and through her guardian Mark Lighthiser; MIKA K., by and through his guardian Rachel Kantor; OLIVIA VESOVICH; JEFFREY K., by and through his guardian Laura King; NATHANIEL K., by and through his guardian Laura King; CLAIRE VLASES; RUBY D., by and through her guardian Shane Doyle; LILIAN D., by and through her guardian Shane Doyle; TALEAH HERNÁNDEZ,

   Plaintiffs and Appellees,

  v.

STATE OF MONTANA, GOVERNOR GREG GIANFORTE, MONTANA DEPARTMENT OF ENVIRONMENTAL QUALITY, MONTANA DEPARTMENT OF NATURAL RESOURCES AND CONSERVATION, and MONTANA DEPARTMENT OF TRANSPORTATION,

   Defendants and Appellants.

APPEAL FROM:  District Court of the First Judicial District,
      In and For the County of Lewis and Clark, Cause No. CDV 2020-307
      Honorable Kathy Seeley, Presiding Judge

COUNSEL OF RECORD:

   For Appellants State Agencies and Governor:

     Dale Schowengerdt (argued), Landmark Law PLLC, Helena, Montana

     Lee M. McKenna, Montana Department of Environmental Quality, Helena, Montana

For Appellant State of Montana:

> Austin Knudsen, Montana Attorney General, Michael D. Russell, Thane Johnson, Assistant Attorneys General, Helena, Montana

> Emily Jones, Jones Law Firm, PLLC, Billings, Montana

> Mark L. Stermitz (argued), Crowley Fleck PLLP, Missoula, Montana

> Selena Z. Sauer, Crowley Fleck PLLP, Kalispell, Montana

For Appellees:

> Roger Sullivan (argued), Dustin Leftridge, McGarvey Law, Kalispell, Montana

> Barbara Chillcott, Melissa Hornbein, Western Environmental Law Center, Helena, Montana

> Nathan Bellinger, Andrea Rodgers, Julia Olson, Our Children's Trust, Eugene, Oregon

> Philip L. Gregory, Gregory Law Group, Redwood City, California

For Amici Curiae Montana Legislators:

> Quentin M. Rhoades, Rhoades & Erickson PLLC, Missoula, Montana

For Amicus Curiae Treasure State Resources Association:

> Steven T. Wade, Brian P. Thompson, Hallee C. Frandsen, Browning, Kaleczyc, Berry & Hove, P.C., Helena, Montana

For Amici Curiae the Montana Chamber of Commerce, Chamber of Commerce of the United States of America, Billings Chamber of Commerce, Helena Chamber of Commerce, and Kalispell Chamber of Commerce:

> William W. Mercer, Matthew H. Dolphay, Holland & Hart LLP, Billings, Montana

> Eric Grant, Hicks Thomas LLP, Sacramento, California

For Amici Curiae The Frontier Institute, The Buckeye Institute, Montana Association of Oil, Gas, & Coal Counties, Montana Coal Council, Montana Mining Association, Montana Taxpayers Association, United Property Owners of Montana, and Westmoreland Mining LLC:

> Andrew M. Grossman, David B. Rivkin Jr., Lee A. Casey, Baker & Hostetler LLP, Washington, District of Columbia

> Keeley O. Cronin, Baker & Hostetler LLP, Denver, Colorado

For Amici Curiae The States of North Dakota, Alabama, Alaska, Arkansas, Idaho, Indiana, Iowa, Mississippi, Missouri, Nebraska, South Carolina, South Dakota, Utah, Wyoming, and the Commonwealth of Virginia:

> Drew H. Wrigley, North Dakota Attorney General, Philip Axt, Solicitor General, Katie Carpenter, Deputy Solicitor General, Bismarck, North Dakota

> Rob Cameron, Special Assistant Attorney General, Helena, Montana

For Amici Curiae Officers of the Legislature:

> Abby J. Moscatel, Blacktail Law Group, PLLC, Kalispell, Montana

For Amicus Curiae NorthWestern Corporation:

> Shannon Heim, John Tabaracci, NorthWestern Energy, Helena, Montana

> F. Matthew Ralph, Dorsey & Whitney LLP, Missoula, Montana

For Amicus Curiae The Navajo Transitional Energy Company:

> Ryen L. Godwin, Lindsay Thane, Schwabe, Williamson & Wyatt, P.C., Seattle, Washington

For Amici Curiae Former Justices:

> Lawrence A. Anderson, Attorney at Law, P.C., Great Falls, Montana

For Amici Curiae Outdoor Recreation Industry Members:

> Rebecca Davis, Brian B. Flynn, Lozeau Drury LLP, Oakland, California

> Paul J. Lawrence, Pacifica Law Group, Seattle, Washington

For Amici Curiae Tribal and Conservation Groups:

> Amanda D. Galvan, Jenny K. Harbine, Earthjustice, Bozeman, Montana

For Amici Curiae Environmental and Constitutional Law Professors:

> James H. Goetz, Goetz, Geddes & Gardner, P.C., Bozeman, Montana

> James R. May, Professor of Law, Austin M. Anderson, Jack Garvey, J.D. Candidates, Widener University Delaware Law School, Wilmington, Delaware

For Amici Curiae American Civil Liberties Union of Montana and American Civil Liberties Union:

> Alex Rate, American Civil Liberties Union of Montana, Missoula, Montana

3

Andrew B. Cashmore, Joshua S. Dulberg, Ropes & Gray LLP, Boston, Massachusetts

Robert A. Skinner, Kaitlin R. O'Donnell, Ropes & Gray LLP, New York, New York

For Amici Curiae Public Health Experts and Doctors:

Timothy Bechtold, Bechtold Law Firm, PLLC, Missoula, Montana

Cale Jaffe, Environmental Law and Community Engagement Clinic, University of Virginia School of Law, Charlottesville, Virginia

For Amicus Curiae Montana Trial Lawyers Association:

Justin P. Stalpes, Beck, Amsden & Stalpes, PLLC, Bozeman, Montana

For Amici Curiae Children's Rights Advocates:

John Morrison, Morrison Sherwood Wilson Deola, PLLP, Helena, Montana

Asha Brundage-Moore, Wyatt Sassman, Environmental Law Clinic, University of Denver Sturm College of Law, Denver, Colorado

Catherine Smith, Robin Walker Sterling, Tanya Washington, Consortium for the Advancement of Children's Constitutional Rights, University of Denver Sturm School of Law, Denver, Colorado

For Amici Curiae Native Nations in Montana, Kathryn Shanley, and Denise Juneau:

Monte Mills, Professor, Native American Law Center, University of Washington School of Law, Seattle, Washington

Jeremiah Chin, Associate Professor of Law, Seattle University School of Law, Seattle, Washington

Mia Montoya Hammersley, Assistant Professor, Fredrick Ole Ikayo, Legal Fellow, Clara Derby, Natasha De La Cruz, Student Clinicians, Environmental Justice Clinic, Vermont Law & Graduate School, South Royalton, Vermont

For Amici Curiae Montana Outdoor Athletes:

Domenic A. Cossi, Western Justice Associates, PLLC, Bozeman, Montana

Christopher G. Winter, Getches-Wilkinson Center for Natural Resources, Energy, and Environment, University of Colorado Law School, Boulder, Colorado

For Amici Curiae Montana Interfaith Power & Light:

Robert J. Guite, Sheppard Mullin Richter & Hampton LLP, San Francisco, California

For Amicus Curiae Byron L. Trackwell:

Byron L. Trackwell, Self-Represented, Topeka, Kansas

Argued and Submitted:  July 10, 2024

Decided:  December 18, 2024

Filed:

_____
Clerk

5

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     The State of Montana, Governor Greg Gianforte, Montana Department of Environmental Quality, Montana Department of Natural Resources and Conservation, and Montana Department of Transportation (State) appeal from the August 14, 2023 Findings of Fact, Conclusions of Law, and Order (Order) of the First Judicial District Court. The District Court declared §§ 75-1-201(2)(a), and -201(6)(a)(ii), MCA, unconstitutional and enjoined the State from acting in accordance with them. We affirm.

¶2     We restate the issues on appeal as follows:

> *Issue One: Whether the Montana Constitution's guarantee of a "clean and healthful environment" includes a stable climate system that sustains human lives and liberties.*
>
> *Issue Two: Whether Plaintiffs have standing to challenge the constitutionality of the MEPA Limitation.*
>
> *Issue Three: Whether the MEPA limitation is unconstitutional under the Montana Constitution's right to a clean and healthful environment.*
>
> *Issue Four: Whether the District Court abused its discretion by denying the State's motion for a psychiatric examination under Rule 35.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3     The world is experiencing a fast rise in temperature that is unprecedented in the geologic record, with the average global temperature increasing by 2.2°F in the last 120 years.[1]  Montana is heating faster than the global average and the rate of warming is

---

[1] The statement of facts comes from the District Court's Order. The State acknowledges in briefing that it does not dispute or challenge the District Court's findings of fact on the science and impacts of climate change and they are entitled to deference. M. R. Civ. P. 52(6); *see also Dunnington v. State Compensation Ins. Fund*, 2000 MT 349, ¶¶ 6, 15, 303 Mont. 252, 15 P.3d 475 (declining to review findings of fact not challenged on appeal).

increasing. Overwhelming scientific evidence and consensus shows that this warming is the direct result of greenhouse gas (GHG) emissions that trap heat from the sun in the atmosphere, primarily from carbon dioxide ($CO_2$) released from human extraction and burning of fossil fuels such as coal, oil, and natural gas. *See also 350 Mont. v. Haaland*, 50 F.4th 1254, 1261–62 (9th Cir. 2022); *Massachusetts v. EPA*, 549 U.S. 497, 521–22, 127 S. Ct. 1438, 1455–56 (2007). These emissions accumulate in the atmosphere and may persist for hundreds of years—causing atmospheric $CO_2$ levels to increase from 280 parts per million (ppm) in pre-industrial times to above 424 ppm today.

¶4 These emissions result in extreme weather events that are increasing in frequency and severity, including droughts, heatwaves, forest fires, and flooding. These extreme weather events will only be exacerbated as the atmospheric concentration of GHGs continues to rise. Projections indicate that under a business-as-usual emissions scenario, Montana will see almost ten additional degrees of warming by 2100 compared to temperatures in 2000. By 2050, Montana will have 11–30 additional days per year with temperatures exceeding 90 degrees and a similar loss of days below freezing. Montana has already seen (and will increasingly see) adverse impacts to its economy, including to recreation, agriculture, and tourism caused by a variety of factors including decreased snowpack and water levels in summer and fall, extreme spring flooding events, accelerating forest mortality, and increased drought, wildfire, water temperatures, and heat waves.

¶5 On March 13, 2020, Plaintiffs—a group of 16 youths between the ages of 2 and 18 at the time—sued the State of Montana, the Governor, and multiple state agencies alleging

7

that the State's actions exacerbated the harm they were feeling from climate change and seeking declaratory and injunctive relief. Specifically, they sought a declaration that certain provisions of Montana's State Energy Policy Act, § 90-4-1001(1)(c)–(g), MCA (2011), and the Montana Environmental Policy Act (MEPA), § 75-1-201(2)(a), MCA (2011) (MEPA Limitation), were unconstitutional. At the time, the Montana State Energy Policy Act promoted the development and use of fossil fuels, and the MEPA Limitation stated that, except for narrowly defined exceptions, "an environmental review conducted pursuant to subsection (1) may not include a review of actual or potential impacts beyond Montana's borders. It may not include actual or potential impacts that are regional, national, or global in nature." Sections 75-1-201(2)(a), 90-4-1001(1)(c)–(g), MCA (2011).

¶6 The State authorizes and permits the extraction, transportation, and consumption of fossil fuels. Many of these activities result in large amounts of GHG emissions such as the mining and extraction of coal, oil, and gas; processing, refinement, and transportation of fossil fuels; and consumption of fossil fuels such as in generating stations. Prior to permitting any of these activities, the State is required to conduct environmental reviews under MEPA. Section 75-1-201(1)(b)(iv), MCA. The State used to consider GHG emissions for these types of projects prior to 2011, but agencies stopped analyzing impacts from GHG emissions that would result from permitted activities pursuant to the MEPA Limitation.

¶7 Plaintiffs also sought a declaration that the Montana Constitution's fundamental right to "a clean and healthful environment" includes a stable climate system that sustains human lives and liberties and that this right was being violated. Additionally, if awarded

8

the declaratory relief that they sought, Plaintiffs sought injunctive relief as follows: (1) enjoining the State from acting in conformance with the unconstitutional laws; (2) an order requiring a full accounting of Montana's GHG emissions; (3) an order requiring the State to develop a remedial plan to reduce GHG emissions and to submit the plan to the court; (4) an order for a special master to be appointed to review the remedial plan; and (5) an order retaining jurisdiction until the State has fully complied with the plan.

¶8 On April 24, 2020, the State filed a motion to dismiss under M. R. Civ. P. 12(b)(1), 12(b)(6), and 12(h)(3), arguing Plaintiffs lack case-or-controversy standing, that the political question doctrine precluded Plaintiffs' requested remedial plan, and that Plaintiffs had failed to exhaust administrative remedies. The District Court granted in part and denied in part the State's motion to dismiss. It concluded that Plaintiffs had established legal standing but that their requested injunctive relief of a remedial plan, a standing master, and retained jurisdiction was beyond its authority. The court thus dismissed all requested injunctive relief except that seeking to enjoin the State from acting in accordance with laws declared unconstitutional. As relevant to this appeal, the State thereafter answered the complaint, and the parties engaged in discovery.

¶9 On July 19, 2022, the State moved for a psychiatric examination of eight of the youth plaintiffs under M. R. Civ. P. 35. It sought to thoroughly interview eight of the plaintiffs about their "psychological and behavioral history, alcohol and drug use, school performance, and exposure to trauma." The District Court denied the motion because Plaintiffs' mental health was not genuinely in controversy, nor had the State established good cause for the examinations as required under Rule 35.

9

¶10 After discovery concluded, the State filed a motion for summary judgment, primarily focusing on the same arguments it made in its motion to dismiss. On March 16, 2023, House Bill 170 (2023 Mont. Laws ch. 73) was signed into law, repealing the Montana State Energy Policy. The State filed a motion to dismiss the claims based on this statute, arguing that its repeal mooted Plaintiffs' claims, which the District Court granted.

¶11 On April 6, 2023, the Thirteen Judicial District Court ruled in a separate case that the plain language of § 75-1-201(2)(a), MCA (2011), did not absolve DEQ of its MEPA obligation under § 75-1-201(1)(b)(iv)(A), MCA, to evaluate a project's environmental impacts—including impacts from GHG emissions—within Montana. *See* Order at 29, *Mont. Env't Info. Ctr. v. Dep't Env't Quality*, No. DV-21-1307 (Mont. Thirteenth Judicial Dist. Apr. 6, 2023). In response, House Bill 971 (2023 Mont. Laws ch. 450) was signed into law, which clarified that, except for narrowly defined exceptions, "an environmental review conducted pursuant to subsection (1) may not include an evaluation of greenhouse gas emissions and corresponding impacts to the climate in the state or beyond the state's borders." Section 75-1-201(2)(a), MCA (2023). Based on the amendment, the State again filed a motion to dismiss Plaintiffs' MEPA Limitation claims.

¶12 On May 19, 2023, MEPA was again amended to add a new subsection, § 75-1-201(6)(a)(ii), MCA, which provides:

> An action alleging noncompliance or inadequate compliance with a requirement of parts 1 through 3, including a challenge to an agency's decision that an environmental review is not required or a claim that the environmental review is inadequate based in whole or in part upon greenhouse gas emissions and impacts to the climate in Montana or beyond Montana's borders, cannot vacate, void, or delay a lease, permit, license, certificate, authorization, or other entitlement or authority unless the review

10

is required by a federal agency or the United States congress amends the federal Clean Air Act to include carbon dioxide as a regulated pollutant.

The State argued that this new provision foreclosed redressability in this case.

¶13 On May 23, 2023, the District Court denied the State's motion for summary judgment. On June 5, the State filed an Emergency Petition for Writ of Supervisory Control and Stay of June 12, 2023 Trial with this Court. The State argued: (1) striking down the MEPA limitation would not redress Plaintiffs' injuries; (2) the originally pleaded MEPA Limitation was no longer law, and Plaintiffs had not pleaded the unconstitutionality of the amended MEPA Limitation; and (3) the facts at issue for trial are not material to the constitutionality of the MEPA Limitation. This Court denied and dismissed the Petition, holding that the State would have an adequate remedy on appeal and that House Bill 971's amendments to the MEPA Limitation had not altered the allegations Plaintiffs had made in their Complaint: "Since the Complaint was filed, the theory of this claim has been that prohibiting consideration of the impacts of climate change in environmental review violated the Montana Constitution. The State does not explain how HB 971 changes that issue for trial." *State v. Mont. First Judicial Dist. Ct.*, No. OP 23-0311, 412 Mont. 554, 531 P.3d 546 (June 6, 2023). A bench trial was held from June 12 to June 20, 2023.

¶14 The District Court found that the fundamental constitutional right to a clean and healthful environment includes climate as part of the environmental life support system; that Plaintiffs had legal standing to bring their claims; that the MEPA Limitation (§ 75-1-201(2)(a), MCA) violated the Constitution's right to a clean and healthful environment and permanently enjoined its enforcement; that § 75-1-201(6)(a)(ii), MCA

11

(2023), which the State had argued prevented review of the MEPA Limitation, was unconstitutional and permanently enjoined it; and the court enjoined the State from acting in accordance with the statutes declared unconstitutional. The State appeals only Plaintiffs' legal standing to bring the case; the constitutionality of the MEPA Limitation; and the District Court's denial of the Rule 35 motion for psychiatric examinations.

**STANDARD OF REVIEW**

¶15 Standing is a justiciability doctrine that limits Montana courts to deciding cases and controversies. *Mitchell v. Glacier Cnty.*, 2017 MT 258, ¶ 6, 389 Mont. 122, 406 P.3d 427. The determination of a party's standing is a question of law that we review de novo. *Mitchell*, ¶ 6.

¶16 "'This Court's review of constitutional questions is plenary.'" *Planned Parenthood v. State*, 2024 MT 178, ¶ 15, 417 Mont. 457, 554 P.3d 153 (quoting *Williams v. Bd. of Cnty. Comm'rs*, 2013 MT 243, ¶ 23, 371 Mont. 356, 308 P.3d 88). Statutes are presumed to be constitutional, and the challenging party bears the burden of proving the statute is unconstitutional. *Planned Parenthood*, ¶ 16. Nevertheless, if the challenging party shows that a law implicates a fundamental constitutional right, the presumption of constitutionality disappears, and the burden necessarily shifts to the State to demonstrate that the law survives strict scrutiny. *Planned Parenthood*, ¶ 16; *see also Mont. Democratic Party v. Jacobsen*, 2024 MT 66, ¶ 11, 416 Mont. 44, 545 P.3d 1074.

¶17 We have held that the right to a clean and healthful environment is a fundamental constitutional right under the Montana Constitution. *Mont. Env't Info. Ctr. v. Dep't of Env't Quality*, 1999 MT 248, ¶ 63, 296 Mont. 207, 988 P.2d 1236 (*MEIC 1999*). Thus, a

12

statute that implicates the right to a clean and healthful environment must be strictly scrutinized and will only be upheld if the State establishes a compelling state interest which is narrowly tailored and is the least onerous path to achieve the State's objective. *MEIC 1999*, ¶ 63.

¶18 We review a district court's findings of fact for clear error. *Larson v. State*, 2019 MT 28, ¶ 16, 394 Mont. 167, 434 P.3d 241. A finding of fact is clearly erroneous if not supported by substantial evidence, the court misapprehended the effect of the evidence, or we are convinced upon our review of the record that the district court is mistaken. *Larson*, ¶ 16. However, where the appellant does not challenge the district court's findings of fact, we confine our review to the correctness of the district court's conclusions of law challenged on appeal. *E.g.*, *State v. Root*, 2003 MT 28, ¶ 7, 314 Mont. 186, 64 P.3d 1035; *Dunnington*, ¶ 6.

¶19 We determine whether a district court abused its discretion by denying a party's request for a physical or mental examination pursuant to Rule 35. *Pumphrey v. Empire Lath & Plaster*, 2006 MT 99, ¶ 16, 332 Mont. 116, 135 P.3d 797. A court abuses its discretion if it acts arbitrarily, without employment of conscientious judgment, or exceeds the bounds of reason resulting in substantial injustice. *Pumphrey*, ¶ 16.

**DISCUSSION**

¶20 *Issue One: Whether the Montana Constitution's guarantee of a "clean and healthful environment" includes a stable climate system that sustains human lives and liberties.*

¶21 Because we resolve standing on Plaintiffs' alleged violation of a constitutional right, we find it necessary to address the parties' arguments relating to whether the Constitution's

13

inalienable right to a clean and healthful environment and environmental life support system includes a stable climate system before addressing the remaining arguments relating to standing.

¶22 Article II, Section 3, of the Montana Constitution guarantees all persons certain inalienable rights, "includ[ing] the right to a clean and healthful environment." Significantly, Article IX, Section 1, of the Montana Constitution further provides that:

> (1) The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations.
> (2) The legislature shall provide for the administration and enforcement of this duty.
> (3) The legislature shall provide adequate remedies for the protection of the environmental life support system from degradation and provide adequate remedies to prevent unreasonable depletion and degradation of natural resources.

¶23 We have previously addressed these constitutional provisions—including a detailed historical review of the 1972 Montana Constitutional Convention—and have "determined that the framers of the Montana Constitution intended it to contain 'the strongest environmental protection provision found in any state constitution'" that is "'both anticipatory and preventative.'" *Park Cnty. Env't Council v. Mont. Dep't of Env't Quality*, 2020 MT 303, ¶ 61, 402 Mont. 168, 477 P.3d 288 (quoting *MEIC 1999*, ¶¶ 66, 77); *see generally MEIC 1999*, ¶¶ 65–77. As relevant here, Delegate McNeil discussed the "environmental life support system" provision found in Article IX, Section 1(3):

> Subsection (3) mandates the Legislature to provide adequate remedies to protect the environmental life-support system from degradation. The committee intentionally avoided definitions, to preclude being restrictive. And the term "environmental life support system" *is all-encompassing, including but not limited to air, water, and land*; and whatever interpretation

14

is afforded this phrase by the Legislature and courts, there is no question that it *cannot be degraded.*

*MEIC 1999*, ¶ 67 (quoting Montana Constitutional Convention, Verbatim Transcript, March 1, 1972, Vol. IV, p. 1201 [hereinafter Convention Transcript]) (first emphasis added).

¶24    The descriptive adjectives "clean and healthful" were not in the original committee proposal because the committee thought that the proposal provided stronger environmental protections without them: "'The majority felt [including "clean and healthful"] would permit degradation of the present Montana environment to a level as defined in Illinois, which may be clean and healthful. *And our intention was to permit no degradation* from the present environment and affirmatively require enhancement of what we have now.'" *MEIC 1999*, ¶¶ 66, 69 (quoting Convention Transcript at 1205) (emphasis in original). Others discussed their concern for "'an environment that is better than healthful. If all we have is a survivable environment, then we've lost the battle. We have nothing left of importance.'" *MEIC 1999*, ¶ 74 (quoting Convention Transcript at 1243–44). The Framers agreed that it was the convention's intent to adopt whichever language was stronger: "[T]he strongest constitutional environmental section of any existing state constitution." *MEIC 1999*, ¶ 75; Convention Transcript at 1200. Six days after approving Article IX, Section 1, the Framers added the right to a clean and healthful environment provision to Article II, Section 3, of the Montana Constitution by a vote of 79 to 7 to interrelate with Article IX, Section 1, to give force to the language of the preamble, and "to recognize that this [right] is, for the time in which we're living and for the foreseeable

15

future, one of the inalienable rights that we hope to assure for our posterity." *MEIC 1999*, ¶ 76; Convention Transcript at 1637.

¶25 We concluded that the Framers' intent was to provide environmental protections which are "both anticipatory and preventative" and did not intend to prevent only environmental degradation that could be conclusively linked to ill health or physical endangerment. *MEIC 1999*, ¶ 77. Indeed, the Constitution's "farsighted environmental protections can be invoked" prior to harmful environmental effects. *MEIC 1999*, ¶ 77. The right's preventative measures "ensure that Montanans' inalienable right to a 'clean and healthful environment' is as evident in the air, water, and soil of Montana as in its law books." *Park Cnty.*, ¶ 62.

¶26 The State argues that the Framers could not have intended to include an environment undegraded from the effects of climate change within the right to a clean and healthful environment because they did not specifically discuss climate change or other global issues when adopting the provision but instead focused on issues such as "'the clear, unpolluted air near Bob Marshall wilderness; it's the clear water and the clear air in the Bull Mountains; and it is the stench in Missoula.'"[2] Quoting Convention Transcript at 1205.

¶27 But our Constitution does not require the Framers to have specifically envisioned an issue for it to be included in the rights enshrined in the Montana Constitution: "A Constitution is not a straight-jacket, but a living thing designed to meet the needs of a

___

[2] We note that the State makes the opposite argument in another case now before us. *See O'Neill v. Gianforte*, No. DA 23-0555, Appellant's Opening Brief at 17–20 (Jan. 12, 2024) (arguing the district court "cannot be right" that a privilege can be recognized in the Constitution only if the Framers explicitly referred to it in the constitutional convention transcripts).

16

progressive society and capable of being expanded to embrace more extensive relations." *Goodell v. Judith Basin Cnty.*, 70 Mont. 222, 236, 224 P. 1110, 1114 (1924); *cf. State ex rel. Fenner v. Keating*, 53 Mont. 371, 379–81, 163 P. 1156, 1158 (1917) (discussing that voting machines, while not contemplated by the framers, were still protected under the Constitution which adapts "to future as well as existing emergencies" so that, if consistent with the object and true principles of the Constitution, it "can be extended to other relations and circumstances which an improved state of society may produce").  Another example includes the right to be free from warrantless searches under Article II, Section 11, of the Montana Constitution (originally Article III, Section 7, of the 1889 Montana Constitution), which protects from future technological advancements surely not contemplated by the Framers of the 1889 Montana Constitution such as electronic listening and recording, *cf. State v. Williams*, 153 Mont. 262, 269, 455 P.2d 634, 638 (1969) (collecting cases), thermal imaging, *State v. Siegal*, 281 Mont. 250, 257, 934 P.2d 176, 180 (1997), *overruled in part on other grounds by State v. Kuneff*, 1998 MT 287, ¶ 19, 291 Mont. 474, 970 P.2d 556, video recordings, *e.g.*, *State v. Solis*, 214 Mont. 310, 693 P.2d 518 (1984), and cell phone communications and data stored on cell phones such as a digital photo library, *State v. Mefford*, 2022 MT 185, ¶ 15, 410 Mont. 146, 517 P.3d 210, among others.  Similarly, there is no debate that the freedom of speech protects online speech, videos, or other speech that could not have been contemplated when Article III, Section 10, of the 1889 Montana Constitution was enacted (now Article II, Section 7, of the Montana Constitution). *Cf. Wadsworth v. State*, 275 Mont. 287, 299, 911 P.2d 1165, 1172 (1996) ("Accordingly, we hold that the opportunity to pursue employment, *while not specifically enumerated as*

17

*a fundamental constitutional right* under Article II, section 3 of Montana's constitution is, notwithstanding, necessarily encompassed within it." (emphasis added)). The State does not address why we should treat the inalienable right to a clean and healthful environment any differently. Should pollutants not in existence or fully understood in 1972 be exempted from the right to a clean and healthful environment just because the Framers did not specifically contemplate them? We think not. New advancements, consistent with the object and true principles of the Constitution, are provided for within Montana's living Constitution.

¶28 The right to a clean and healthful environment is "forward-looking and preventative." *Park Cnty.*, ¶ 62. It does not require the Framers to have contemplated every environmental harm that is protected under "'the strongest environmental protection provision found in any state constitution'" *Park Cnty.*, ¶ 61 (quoting *MEIC 1999*, ¶ 66).

¶29 Plaintiffs showed at trial—without dispute—that climate change is harming Montana's environmental life support system now and with increasing severity for the foreseeable future. The State and its agencies have previously acknowledged such current and future impacts to the Montana environment stemming from climate change, many of which can already be increasingly seen today.[3] Plaintiffs showed that climate change *does*

---

[3] *See, e.g.*, Final Environmental Impact Statement Highwood Generating Station 3-46 (Mont. Dep't Env't Quality, Jan. 2007) (available at https://archive.legmt.gov/content/Publications/MEPA/2007/deq0202_2007004.pdf [https://perma.cc/AAP4-8EQA]). For example, the State noted concerns over future harms stemming from GHG emissions particular to Montana such as:
- A loss of glaciers within Montana. *See, e.g.*, *Glacier Repeat Photos*, Nat'l Park Serv. (last updated Aug. 12, 2024), https://www.nps.gov/glac/learn/nature/glacier-repeat-photos.htm [https://perma.cc/L5B7-5L9H].
- Declining snowpack and stressed water supplies for human use (including for crop production) and cold-water fish. *See, e.g.*, *Governor's Drought and Water Supply Advisory*

impact the clear, unpolluted air of the Bob Marshall wilderness; it *does* impact the availability of clear water and clear air in the Bull Mountains; and it *does* exacerbate the wildfire stench in Missoula, along with the rest of the State. The District Court made extensive, undisputed findings of fact that GHG emissions are drastically altering and degrading Montana's climate, rivers, lakes, groundwater, atmospheric waters, forests, glaciers, fish, wildlife, air quality, and ecosystem: "Anthropogenic climate change is impacting, degrading, and depleting Montana's environment and natural resources, including through increasing temperatures, changing precipitation patterns, increasing droughts and aridification, increasing extreme weather events, increasing severity and intensity of wildfires, and increasing glacial melt and loss."

---

*Committee Snowpack and Water Supply Forecast Update May 9, 2024*, Nat. Res. Conservation Serv., https://drought.mt.gov/_docs/DWSAC-Materials/NRCS-SnowpackReport-May-2024.pdf [https://perma.cc/MB2D-VQB9] (showing significantly below median snowpack levels for much of Montana, including many areas lowest on record); Amanda Eggert, *Montana asserts its water rights to protect fisheries, recreation on several major rivers*, Mont. Free Press (Aug. 21, 2024), https://montanafreepress.org/2024/08/21/montana-asserts-its-water-rights-to-protect-fisheries-recreation-on-several-major-rivers/ [https://perma.cc/5E9C-TSL2].

- Difficulties for ski areas to survive. *See, e.g.*, Teton Pass Ski Area (@skitetonmt), Instagram (Feb. 8, 2024), https://www.instagram.com/p/C3GRJ_tO4lX/?img_index=6 [https://perma.cc/G5YE-TR45] (announcing closure for rest of season due to "insurmountable" lack of snow); Turner Mountain Ski Area, Facebook (Jan. 25, 2024, through March 5, 2024), https://www.facebook.com/TurnerMountain/ [https://perma.cc/N826-EP9K] (showing repeated closures due to low snow).
- Loss of wildlife habitat.
- Effects on human health from extreme heat waves and expanding diseases such as West Nile. *See, e.g.*, *West Nile Virus*, Mont. Dep't of Health & Hum. Servs. (last accessed Dec. 11, 2024), https://dphhs.mt.gov/publichealth/cdepi/diseases/westnilevirus [https://perma.cc/LA5G-E3RZ] (noting the first case of West Nile in Montana occurred in 2002 with outbreaks now occurring roughly every five years).

¶30 We reject the argument that the delegates—intending the strongest, all-encompassing environmental protections in the nation, both anticipatory and preventative, for present and future generations—would grant the State a free pass to pollute the Montana environment just because the rest of the world insisted on doing so. The District Court's conclusion of law is affirmed: Montana's right to a clean and healthful environment and environmental life support system includes a stable climate system, which is clearly within the object and true principles of the Framers inclusion of the right to a clean and healthful environment.

¶31 *Issue Two: Whether Plaintiffs have standing to challenge the constitutionality of the MEPA Limitation.*

¶32 Parties are entitled to bring a direct action to enforce their inalienable right to a clean and healthful environment but must still meet minimum criteria to establish standing. *MEIC 1999*, ¶¶ 28, 45. Standing is a threshold question of justiciability, required by Article VII, Section 4(1), of the Montana constitution, that focuses on whether the claimant is a proper party to assert a claim. *Larson*, ¶ 45. A plaintiff has legal standing to assert a claim if (1) the claim is based on an alleged wrong or illegality that has caused, or is likely to cause, the plaintiff to suffer a past, present, or threatened injury to person, property, *or* exercise of civil or constitutional right and (2) the harm is of a type that legal relief can effectively alleviate, remedy, or prevent. *Larson*, ¶ 46 (citing *Schoof v. Nesbit*, 2014 MT 6, ¶¶ 20–21, 373 Mont. 226, 316 P.3d 831); *Schoof*, ¶ 15 (requiring a "personal stake" in the outcome of the controversy). Justiciability requires only one plaintiff to have standing

to seek the same equitable relief as another plaintiff. *Larson*, ¶ 47 n.21; *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶ 45, 356 Mont. 41, 230 P.3d 808.

¶33 Alleging the unconstitutionality of a statute generally or in the abstract is insufficient to confer standing. *Larson*, ¶ 46; *Schoof*, ¶¶ 20–21. But alleging facts stating a claim that a statute violates a plaintiff's constitutional right is sufficient to show an injury, and seeking to vindicate those constitutional rights confers standing. *See generally Schoof*, ¶¶ 17–23; *see also Gazelka v. St. Peter's Hosp.*, 2015 MT 127, ¶ 15, 379 Mont. 142, 347 P.3d 1287; *Weems v. State*, 2019 MT 98, ¶ 9, 395 Mont. 350, 440 P.3d 4 ("'A plaintiff's standing may arise from an alleged violation of a constitutional or statutory right.'" (quoting *Mitchell*, ¶ 11)); *Advocs. for Sch. Trust Lands v. State*, 2022 MT 46, ¶ 28, 408 Mont. 39, 505 P.3d 825.

¶34 In *Schoof*, we overruled *Fleenor v. Darby School District*, 2006 MT 31, 331 Mont. 124, 128 P.3d 1048, which required a plaintiff to allege an injury beyond that of a constitutional violation and to distinguish the plaintiff's constitutional harm from that of the public. *Schoof*, ¶¶ 17, 20. We overruled *Fleenor* because these requirements imposed standing thresholds incompatible with the constitutional rights to know and participate. *Schoof*, ¶ 17.

¶35 We held that under the right to know and right to participate guaranteed in Article II, Sections 8 and 9, of the Montana Constitution, Schoof's "personal stake" in the case was the opportunity to participate in the challenged government action. *Schoof*, ¶ 19. To vindicate those rights, we held that Schoof need not demonstrate a personal stake in the specific policy at issue or an injury beyond being deprived of his constitutional rights:

"Otherwise, the constitutional rights to know and participate could well be rendered superfluous because members of the public would be unable to satisfy traditional standing requirements to properly enforce [their constitutional rights]." *Schoof*, ¶ 19.[4]

¶36     Here, Plaintiffs have shown a sufficient personal stake in their inalienable right to a clean and healthful environment.  Mont. Const. art. II, § 3 ("All persons are born free and have certain inalienable rights.    They include the right to a clean and healthful environment . . . .").  We have said that this right must be read together with the right guaranteed by Article IX, Section 1, of the Montana Constitution:[5] "The state and each person shall maintain and improve a clean and healthful environment in Montana for present and future generations." *MEIC 1999*, ¶ 77.  Plaintiffs definitively showed at trial, without dispute, that climate change is causing serious and irreversible harms to the environment in Montana—assuring them and future Montanans a "harmful" rather than "healthful" environment as guaranteed by the Constitution.  As discussed above, climate change is a serious threat to the constitutional guarantee of a clean and healthful environment in Montana.  "Montanans' right to a clean and healthful environment is contemplated by an affirmative duty upon their government to take active steps to realize

---

[4] Additionally, we have noted that the Uniform Declaratory Judgment Act, § 27-8-202, MCA, recognizes the justiciability requirements for standing: "Any person interested . . . whose rights, status, or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status, or other legal relations thereunder." *See Larson*, ¶ 45 n.19.

[5] And with the preamble: "We the people of Montana grateful to God for the quiet beauty of our state, the grandeur of our mountains, the vastness of our rolling plains, and desiring to improve the quality of life, equality of opportunity and to secure the blessings of liberty for this and future generations do ordain and establish this constitution." *MEIC 1999*, ¶ 77.

this right." *Park Cnty.*, ¶ 63. Plaintiffs alleged that the MEPA Limitation infringed on their right to a clean and healthful environment and the State's affirmative duty to take active steps to realize this right by providing a blanket prohibition on reviewing GHG emissions in all projects, including those that will have a significant effect on the quality of the human environment. *Accord MEIC 1999*, ¶¶ 21, 45 (holding plaintiffs had "standing to challenge conduct which has an arguably adverse impact" on the river notwithstanding that the arsenic load of the discharged water would "be close to nondetectable"). This was sufficient for standing purposes; whether it is sufficient to show a violation of their constitutional right requiring application of strict scrutiny is a separate issue. *MEIC 1999*, ¶ 45.

¶37 Further, Plaintiffs have an additional personal stake under the plain language of MEPA, which states that the Legislature, mindful of its constitutional obligations to a clean and healthful environment, provides for an adequate review of state actions to ensure that "environmental attributes are *fully considered* by the legislature in enacting laws to fulfill constitutional obligations" and "the public is informed of the anticipated impacts in Montana of potential state actions." Section 75-1-102(1), MCA (emphasis added). Additionally, a purpose of MEPA "is to assist the legislature in determining whether laws are adequate to address impacts to Montana's environment and to inform the public and public officials of potential impacts resulting from decisions made by state agencies." Section 75-1-102(3)(a), MCA. Plaintiffs have a personal stake in being fully informed of the anticipated impacts of potential state actions.

23

¶38 The general rule is that a "plaintiff's injury must be 'distinguishable from the injury to the public generally.'" *Schoof*, ¶ 20 (quoting *Fleenor*, ¶ 9). *Schoof* clarified the purpose of this rule is to ensure that the plaintiff's alleged injury is "concrete" rather than "abstract." *Schoof*, ¶ 20. For example, a common concern that the State obey the law is an abstract injury, whereas even a widely shared harm can confer standing if it is concrete. *Schoof*, ¶ 20. "'[T]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody.'" *Schoof*, ¶ 21 (quoting *Helena Parents Comm'n v. Lewis & Clark Cnty. Comm'rs*, 277 Mont. 367, 374, 922 P.2d 1140, 1144 (1996)).

¶39 Thus, when an alleged injury is premised on the violation of constitutional rights, standing depends on whether the right could be understood as granting persons in the plaintiff's position a right to judicial relief. *Schoof*, ¶ 21; *see also Shockley v. Cascade Cnty.*, 2014 MT 281, ¶¶ 16, 22, 376 Mont. 493, 336 P.3d 375. We held that the constitutional harm in *Schoof* was concrete—though widely shared by others—because the constitutional and statutory rights were directed at the public and persons, and thus all citizens had suffered a concrete injury. *Schoof*, ¶ 21 ("Importantly, the governing provisions in this case are directed to the citizen: 'The public' . . . 'No person' . . . ." (quoting Mont. Const. art. II, §§ 8, 9)).

¶40 In the same way, the constitutional rights at issue here are directed at the public and persons generally. Article II, Section 3, of the Montana Constitution guarantees that "*[a]ll persons* are born free and have certain inalienable rights," including the right to a clean and healthful environment. (Emphasis added.) *See also* Mont. Const. art. IX, § 1

24

("each person . . . for present and future generations"). The language of the constitutional provisions guaranteeing a clean and healthful environment speak for themselves. They apply to all persons of the state, including "present *and future* generations." Mont. Const. art. IX, § 1 (emphasis added); *accord Park Cnty.*, ¶ 62 ("*Montanans'* inalienable right to a 'clean and healthful environment'" (emphasis added)); *Seven Up Pete Venture v. Mont.*, 2005 MT 146, ¶ 46, 327 Mont. 306, 114 P.3d 1009 ("'[t]he right to a clean and healthful environment' is an inalienable right of *every person*." (emphasis added)); *see also* Convention Transcript at 1639 (Article II, Section 3, of the Montana Constitution "does present the right of every person."). The governing constitutional provisions are directed at the citizen and can be understood as granting persons in the Plaintiffs' position a right to judicial relief. Thus, the constitutional harm discussed above is concrete, though it is widely shared.[6] *Cf. Schoof*, ¶ 21; *see also Massachusetts*, 549 U.S. at 522, 127 S. Ct. at 1456 ("That these climate-change risks are 'widely shared' does not minimize Massachusetts' interest in the outcome of this litigation."). Additionally, MEPA is directed at the citizen: one of its purposes is to fully inform "the public" of anticipated environmental impacts of potential state actions. Section 75-1-102(1)(b), MCA; *see also* § 75-1-103(3), MCA ("The legislature recognizes that *each person* is entitled to a healthful environment." (emphasis added)). Like *Schoof*, Plaintiffs have shown a

---

[6] The State cites federal caselaw holding that plaintiffs in distinguishable but similar cases did not have standing. The federal constitution notably does not include an inalienable right to a clean and healthful environment. Additionally, the State's citation to *Juliana v. United States*, 947 F.3d 1159, 1171 (9th Cir. 2020), is inapposite as the claims in *Juliana* were similar to claims the District Court dismissed in this case that are not on appeal before this Court.

25

sufficiently concrete injury to their constitutional right to a clean and healthful environment—that the MEPA Limitation prevents the State from considering GHG emissions in all projects that may have an impact on the Montana human environment.

¶41 The Dissent argues "Plaintiffs' stories are not legally unique" and "are not distinguishable from the general public at large," Dissent, ¶ 83, but fails to acknowledge *Schoof*, ¶¶ 20–21, which clarified the test for what types of injuries are distinguishable from the public at large. As discussed above, just like in *Schoof*, the rights at issue here are sufficiently concrete as they "can be understood as granting persons in the plaintiff's position a right to judicial relief." *Schoof*, ¶ 21. The Dissent acknowledges that similarly compelling stories could be drawn from "one million other Montanans." Dissent, ¶ 83. But holding that there is no sufficient injury for *any* Montanan to bring a claim asserting their constitutional right to a clean and healthful environment just because *every* Montanan is harmed by climate change—as the Dissent agrees—would return us to the misapplication of standing requirements from *Fleenor* that we overruled in *Schoof*. *Schoof*, ¶¶ 19–20 (holding that Schoof had standing to assert an interest in observing the Commissioners' actions: a "like-compelling stor[y]" that could "be found within the collective experience of the entire Montana population," Dissent, ¶ 83, who were similarly deprived of their constitutional rights to know and participate). The Dissent's argument would foreclose standing in other environmental harm cases where we have long recognized a plaintiff's standing. *See MEIC 1999*, ¶ 43 (recognizing that "the injury need not be exclusive to the litigant" because to so hold "'would effectively immunize the statute from constitutional review.'" (quoting *Gryczan v. State*, 283 Mont. 433, 446, 942 P.2d 112, 120 (1997))). For

26

example, in *MEIC 1999*, plaintiffs lived and recreated in the Clark Fork drainage—as many thousands of other people likewise do—yet we did not deny them standing to bring their claims even though thousands of other people could have likewise brought claims for the same injuries. *MEIC 1999*, ¶¶ 4, 45. Just because the harm and the area of harm here is larger should likewise not preclude standing to litigants who have demonstrated a sufficient stake in an infringement on their constitutional rights.[7] Indeed, to so hold "would mean that the *most* injurious and widespread Government actions could be questioned by nobody." *Schoof*, ¶ 21 (emphasis added).

¶42 The Dissent acknowledges that climate change directly impacts each and every Montanan, Dissent, ¶ 83, yet argues that no government action has directly impacted any Montanan in this case. But the Dissent conflates the alleged injury in the case—that the MEPA Limitation unconstitutionally infringes on Montanans' right to a clean and healthful environment—with climate change, Dissent, ¶ 89, which is a separate injury that we do not rely on in our standing analysis. *See* Opinion, ¶¶ 52, 55. Nor is the injury here merely "that the statute fails to protect the citizen against environmental harm," Dissent, ¶ 86, or merely "allowed by a statute," Dissent, ¶ 88, but instead actively causes the constitutional harm by statutory mandate. *See* § 75-1-201(2)(a), MCA ("an environmental review . . . *may not* include an evaluation of greenhouse gas emissions . . . ." (emphasis added)). Plaintiffs allege the MEPA Limitation is an unconstitutional infringement on their

---

[7] The Dissent would preclude standing here "even if [climate change] has affected [Plaintiffs] more than others," Dissent, ¶ 83, which, even before *Schoof* clarified the rule, would have been enough to show that their injury was distinguishable from the general public.

27

right to a clean and healthful environment because it prevents government agencies, in *all* cases, from analyzing harmful GHG emissions. Plaintiffs here have shown "a concrete current or impending violation of the[ir] constitutional right . . . by way of the government's application of the [MEPA Limitation] to the Plaintiffs." Dissent, ¶ 89. They showed at trial that since the MEPA Limitation was enacted in 2011, state agencies have stopped considering (and will continue to not consider) GHG emissions in all cases because of the MEPA Limitation's prohibition, even though the Constitution guarantees them a right to a stable climate system and MEPA is necessary to "help bring the Montana Constitution's lofty goals into reality by enabling fully informed and considered decision making, thereby minimizing the risk of irreversible mistakes depriving Montanans of a clean and healthful environment." *Park Cnty.*, ¶ 70.

¶43 Turning to causation and redressability, the State acknowledges in briefing that "Plaintiffs [are] not suing to stop climate change. They [are] suing to challenge the constitutionality of [a] specific provision of MEPA: section 75-1-201(2)(a)." Yet, the State then argues that Plaintiffs must prove that the MEPA Limitation has in fact caused climate change. The State's argument is misplaced. The focus instead is whether the challenged statute is a cause of, or is likely to cause, an unconstitutional infringement on Plaintiff's right to a clean and healthful environment.

¶44 Thus, like in *Schoof*, to have standing here Plaintiffs must show that the challenged law impacts their right to a clean and healthful environment. They showed that the State's policies, including the MEPA Limitation (and, before it was repealed, the state energy policy), impacts their right by prohibiting an analysis of GHG emissions, which

blindfolded the State, its agencies, the public, and permittees when an analysis is necessary to inform the State's affirmative duty to take active steps to realize the right to a clean and healthful environment.

¶45   The State next argues that the MEPA Limitation is merely a procedural statute and that substantive permitting statutes, if any, are the statutes that "cause" Plaintiffs' constitutional harms.  The State also argues that, because it is procedural, declaring the MEPA Limitation unconstitutional will not redress Plaintiffs' injuries.[8]  But the State acknowledges that multiple sources may cause an injury and that redressability is not defeated if the statute at issue at least partially caused the injury.  Acknowledging this, the State cites to *Juliana*, 947 F.3d at 1169 (finding causation notwithstanding multiple non-hypothetical links in the chain because the "host of federal policies" that were challenged were likely a substantial factor in causing plaintiffs' injuries) and *WildEarth Guardians v. United States Dep't of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015) ("So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury.").

¶46   We rejected a similar argument in *Weems*.  There, the State argued that, irrespective of the challenged statute, plaintiffs could not perform abortions.  *Weems*, ¶ 10.  We concluded plaintiffs had sufficiently alleged for standing purposes that, "but for the existence of the statutory restriction," the plaintiffs "would be able" to perform abortions.

---

[8]  Additionally, Plaintiffs argue state agencies will have discretion to deny permits under substantive permitting statutes when the procedural MEPA Limitation is declared unconstitutional while the State argues it will not.  Those substantive permitting statutes are not before us, and we decline to address their constitutionality on this record.

*Weems*, ¶ 13. Similarly here, at trial Plaintiffs showed that but for the MEPA Limitation, state agencies *would be able* to conduct evaluations of GHG emissions in their environmental reviews—namely, as discussed further below, state agencies used to perform them prior to the 2011 MEPA Limitation. *Cf. Advocs. for Sch. Trust Lands*, ¶ 28 (claim was ripe "where the statute itself allegedly deprived the plaintiffs of a constitutional right"). Now however, because the State is not solely responsible for climate change, it avoids its responsibility when conducting environmental reviews and asks us to sidestep a potential constitutional harm because it cannot reverse climate change alone.

¶47 Like *Weems*, ¶ 14, the State's argument here is circular: it maintains that Plaintiffs cannot challenge the MEPA Limitation unless they also challenge the substantive permitting statutes, but acknowledges that MEPA's purpose is to "provide for the adequate review of state actions in order to ensure that: (a) environmental attributes are fully considered by the legislature in enacting laws to fulfill constitutional obligations; and (b) the public is informed of the anticipated impacts in Montana of potential state actions." Section 75-1-102(1), MCA. Substantive permitting statutes are not at issue here and we reject the parties' attempts to insert advisory opinions on their constitutionality into this litigation. Plaintiffs have made a sufficient showing for standing that the MEPA Limitation violates a constitutional right and infringes on both the state agency's constitutional obligations and the Legislature's duty to use MEPA as a source of information when substantive statutes are not fulfilling constitutional obligations. *Park Cnty.*, ¶¶ 69, 89; *see also* § 27-8-201, MCA ("Courts of record within their respective jurisdictions shall

30

have power to declare rights, status, and other legal relations *whether or not further relief is or could be claimed*." (emphasis added)); § 27-8-202, MCA.

¶48 The State's citation to *Donaldson v. State*, 2012 MT 288, 367 Mont. 228, 292 P.3d 364, is also inapposite. In that case, plaintiffs did not seek a declaration that any particular law was unconstitutional. Rather, they sought a declaration that an entire statutory scheme was unconstitutional—without reference to any statute—potentially impacting many statutes in unknowable and unintended ways. *Donaldson*, ¶ 4. The district court concluded, and we agreed, that the proper way to deal with their concerns were with specific suits directed at specific, identifiable statutes. *Donaldson*, ¶ 4. While we acknowledged that we have directed the Legislature to comply with specific constitutional duties while holding specific statutes unconstitutional, *Donaldson*, ¶ 8 (citing *Helena Elementary Sch. Dist. No. 1 v. State*, 236 Mont. 44, 769 P.2d 684 (school funding); *Snetsinger v. Mont. Univ. System*, 2004 MT 390, 325 Mont. 148, 104 P.3d 445 (provision of employment benefits)), we held that in a case without specific statutes alleged unconstitutional, the broad injunction and declaratory judgment sought would just lead to further confusion and litigation: "Broadly determining the constitutionality of a 'statutory scheme' that may, according to [p]laintiffs, involve hundreds of separate statutes, is contrary to established jurisprudence." *Donaldson*, ¶¶ 8–10. Here, Plaintiffs brought a challenge to specific statutes—namely the MEPA Limitation and the State Energy Policy. The State and Dissent seemingly posit that other substantive permitting statutes cause Plaintiffs additional constitutional harm and that they should have also challenged those statutes. *See* Dissent, ¶¶ 85, 88, 90, 96, 99 (asserting that the MEPA Limitation *alone* does

31

not cause Plaintiffs' injuries nor will declaring it unconstitutional redress the injuries). True or not, "[w]e will not avoid our responsibility to resolve the dispute actually before us by hypothesizing about whether other disputes might arise at a future time." *Park Cnty.*, ¶ 56. To require an act to be the *sole* cause of an injury before it could be redressed, Dissent, ¶ 90, would upend decades of jurisprudence from this Court and the United States Supreme Court that hold an injury caused in part by a challenged action is redressable even if it does not redress the injury in full. *See, e.g.*, Opinion, ¶¶ 45, 52 (citing to federal caselaw). Declaring the MEPA Limitation unconstitutional will redress the constitutional injury caused by that statute, regardless of whether or not other statutes also cause constitutional harms. To hold otherwise would close the doors of the courts to plaintiffs trying to vindicate personal constitutional rights unless they could identify every other instance where their rights might be infringed and sought to litigate those at the same time.

¶49 The State repeatedly tries to redirect our focus to *global* climate change and the staggering magnitude of the issue confronting the world in addressing it. The State argues that it should not have to address its affirmative duty to a clean and healthful environment because even if Montana addresses its contribution to climate change, it will still be a problem if the rest of the world has not reduced its emissions. This is akin to the old ad populum fallacy: "If everyone else jumped off a bridge, would you do it too?" *See also 350 Mont.*, 50 F.4th at 1266 (rejecting environmental assessment's analysis that even though the project would "add more fuel to the fire [of global warming]," it would have no significant impact because "its contribution w[ould] be smaller than the worldwide total of all other sources of GHGs"). Plaintiffs may enforce their constitutional right to a

clean and healthful environment against the State, which owes them that affirmative duty, without requiring everyone else to stop jumping off bridges or adding fuel to the fire. *Cf. Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1217 (9th Cir. 2008). Otherwise, the right to a clean and healthful environment is meaningless.

¶50 Similarly, the State argues that even if the MEPA Limitation is unconstitutional, and the State begins analyzing GHG emissions and factoring that analysis into its substantive permitting decisions, Montana's resulting lower GHG emissions will have a negligible effect on global climate change: "At bottom, no single judicial action in Montana can meaningfully reduce climate change, and thus redress Plaintiffs' injuries." Like with causation, the State misconstrues what redressability looks like in a case that challenges a statute as violating a constitutional right.

¶51 It may be true that the MEPA Limitation is only a small contributor to climate change generally, and that declaring it unconstitutional will do little to reverse climate change. But our focus here, as with Plaintiffs' injuries and causation, is not on redressing climate change, but on redressing their constitutional injuries: whether the MEPA Limitation unconstitutionally infringes on Plaintiffs' right to a clean and healthful environment. *Cf. Schoof*, ¶ 17 (acknowledging that *Fleenor* erred by expanding the focus of a constitutional injury to require a greater showing of injury than the constitutional injury itself). Furthermore, we have rejected a similar argument regarding whether adding more pollutants to an already polluted waterbody or extending the time that the waterbody would remain polluted constituted material damage. *See Mont. Env't Info. Ctr. v. Westmoreland*

*Rosebud Mining, LLC*, 2023 MT 224, ¶ 57, 414 Mont. 80, 545 P.3d 623. To hold as the State argues today would mean that plaintiffs in *Westmoreland* may not have had standing because the waterbody was already polluted and addressing their concerns related to mining would not bring the waterbody back to a non-polluted state.

¶52 Thus, the question is whether legal relief can effectively alleviate, remedy, or prevent Plaintiffs' constitutional injury, not on whether declaring a law unconstitutional will effectively stop or reverse climate change. *Larson*, ¶ 46. To make that a requirement for standing would effectively immunize the State from any litigation over whether its laws are in accordance with the "affirmative [constitutional] duty upon the[] government to take active steps to realize" Montanans' right to a clean and healthful environment. *Park Cnty.*, ¶ 63. Even so, "[a] reduction in domestic emissions would slow the pace of global emissions increases, no matter what happens elsewhere." *Massachusetts*, 549 U.S. at 525–26, 127 S. Ct. at 1458; *see also Massachusetts*, 549 U.S. at 524–25, 127 S. Ct. at 1457–58 ("That a first step might be tentative does not by itself support the notion that . . . courts lack jurisdiction to determine whether that step conforms to law. . . . While it may be true that regulating [GHG] emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether [the State] has a duty to take steps to *slow* or *reduce* it." (emphases in original)). Plaintiffs allege that the MEPA Limitation causes a violation of their constitutional rights, which is their injury. Declaring *that* law unconstitutional and enjoining the State from acting in accordance with it will effectively alleviate *that* constitutional injury—that the State is acting in opposition to its affirmative constitutional duty through the MEPA Limitation—even if other statutes not at issue here

34

also cause constitutional injuries. *Accord Franklin v. Massachusetts*, 505 U.S. 788, 803, 112 S. Ct. 2767, 2777 (1992) ("[W]e may assume it is substantially likely that [executive and legislative] officials would abide by an authoritative interpretation" of a statute and the Constitution, even when injunctive relief is not appropriate.).

¶53 Moreover, we recognize that denying Plaintiffs standing under the State's arguments would effectively immunize from review an important constitutional question to the public. *See Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 33, 360 Mont. 207, 255 P.3d 80 (citing *Missoula City-County Air Pollution Control Bd. v. Bd. of Env't Review*, 282 Mont. 255, 260, 937 P.2d 463, 466 (1997); *Gryczan*, 283 Mont. at 446, 942 P.2d at 120). We note that at oral argument, counsel for the State stressed that there was no specific permit challenged below and that, if there were, Plaintiffs might have standing. Yet the State as intervenor makes the same standing arguments in a case challenging the constitutionality of the 2011 MEPA Limitation as applied to a particular permit. *See, e.g.*, *Mont. Env't Info. Ctr. v. Mont. Dep't of Env't Quality*, No. DA 23-0225, Intervenor State of Montana's Response Brief at 11–12 (Dec. 13, 2023). Thus, whether Plaintiffs challenge the MEPA Limitation on its face or as applied to a specific permit, accepting the State's arguments in both cases would effectively immunize review of an important constitutional question to the public. *Accord MEIC 1999*, ¶ 71 ("'[I]f you're really trying to protect the environment, you'd better have something whereby you can sue or seek injunctive relief before the environmental damage has been done.'" (quoting Convention Transcript at 1230)); *Park Cnty.*, ¶ 62 ("Montanans have a right not only to reactive measures after a constitutionally-proscribed environmental harm has occurred, but

35

to be free of its occurrence in the first place."). Plaintiffs have standing for the declaratory and injunctive relief they seek because they allege that the MEPA Limitation violates their right to a clean and healthful environment and declaring it unconstitutional will alleviate the harm that that statute causes to their constitutional right. *Accord Schoof*, ¶¶ 12–23.

¶54 Finally, the Dissent also takes issue with the fact that Plaintiffs have not brought their challenge to the MEPA Limitation in the context of a specific permit. While this would be necessary if Plaintiffs had brought this as an "as applied" constitutional challenge (i.e., the statute is unconstitutional as applied to the specific circumstances presented), here Plaintiffs alleged the statute was facially unconstitutional—that no set of circumstances exists where the State could prohibit state agencies from analyzing GHG emissions in all permitting actions. This is inapposite to *Broad Reach Power, LLC v. Montana Department of Public Service Regulation, Public Service Commission*, which the Dissent relies on. *See Broad Reach Power, LLC v. Mont. Dep't of Pub. Serv. Regul., Pub. Serv. Comm'n*, 2022 MT 227, 410 Mont. 450, 520 P.3d 301. In *Broad Reach*, appellants brought their due process challenge essentially in a vacuum because they brought their constitutional challenge "as applied" to their circumstances, without demonstrating how their rights were violated with any facts particular to them. *Broad Reach*, ¶ 13. Unlike their as applied challenge, "facial challenges are not dependent on the facts of a particular case, because the statute would be unconstitutional *in all cases*." *Broad Reach*, ¶ 11 (citing *City of Missoula v. Mt. Water Co.*, 2018 MT 139, ¶ 21, 391 Mont. 422, 419 P.3d 685) (emphasis added); *see also Park Cnty.*, ¶ 86 ("our conclusion that § 75-1-201(6)(c) and (d), MCA, is unconstitutional flows *from the content of the statute itself, not the particular*

36

*circumstances of the litigants.*" (emphasis added)).  Why then the Dissent would require Plaintiffs to bring their facial challenge to the MEPA Limitation within the context of a particular permit is unclear.[9]  *Compare MEIC 1999*, ¶ 80 (limiting the Court's holding as applied to the facts in that case).  This Opinion "meaningfully attach[es] to provide redress" by declaring § 75-1-201(2)(a), MCA, unconstitutional and "barring or limiting . . . government action" by enjoining the State from acting in accordance with the unconstitutional MEPA Limitation.  Dissent, ¶ 95; *see* Opinion, ¶¶ 56–69.  Like the District Court's Order, this Opinion is not limited to any particular set of facts as Plaintiffs facially challenge the constitutionality of the MEPA Limitation.

¶55     Although not necessary for our constitutional standing analysis, we summarize the multitude of personal, aesthetic, economic, and property injuries Plaintiffs showed at trial stemming from Montana's energy and permitting policies.  *See Barrett v. State*, 2024 MT 86, ¶ 31, 416 Mont. 226, 547 P.3d 630 (declining to address whether plaintiffs had standing for alleged injuries to constitutional rights when individualized injuries were sufficient).  Generally, the District Court found that children are uniquely vulnerable to the impacts and consequences of climate change (including the impacts from heatwaves, droughts, air pollution, and other extreme weather events on young bodies) because their bodies and minds are still developing.  More specifically, Plaintiffs discussed at trial: the fear they feel

---

[9] Of course, as shown in the above analysis—and in agreement with the Dissent—plaintiffs must still have standing to challenge a statute as facially unconstitutional.  Plaintiffs here demonstrated standing not by alleging facts that the MEPA Limitation was unconstitutional because of how the State applied it to a particular permit but because they sufficiently alleged that the MEPA Limitation unconstitutionally infringes on their right to a clean and healthful environment.  This is distinct from a common, abstract interest in the constitutionality of a law.  *Accord Schoof*, ¶ 20.

from disappearing glaciers in Montana (both aesthetically and from the dependence many communities place on the water they provide throughout the summer); the impacts climate change is having on culturally important native wildlife, plants, snow, and practices; summer smoke and extreme heat preventing Plaintiffs from enjoying outdoor activities and sports which are important to them; the economic effects that less snowpack and more drought are having on ranches owned by Plaintiffs' families and the resulting emotional harm; the emotions they face when confronted with growing up in this quickly changing state and the prospect of raising the next generation in increasingly dangerous weather patterns; and many other harms to their recreational, work, and physical and emotional wellbeing. *See also generally* Brief of Amici Curiae Public Health Experts and Doctors, No. DA 23-0575 (Mont. March 21, 2024) (corroborating harms with peer-reviewed medical literature). These aesthetic, recreational, and economic injuries are also sufficient to satisfy the constitutional requirements for personalized injury, even though widely shared. *See Park Cnty.*, ¶ 20.

¶56    *Issue Three: Whether the MEPA limitation is unconstitutional under the Montana Constitution's right to a clean and healthful environment.*

¶57    "[T]he right to a clean and healthful environment is a fundamental right . . . [and] any statute or rule which implicates that right must be strictly scrutinized." *MEIC 1999*, ¶ 63. Strict scrutiny applies to laws that implicate either Article II, Section 3, or Article IX, Section 1, of the Montana Constitution. *MEIC 1999*, ¶ 64. Under strict scrutiny, the State must demonstrate a compelling state interest and that the statute is closely tailored to effectuate that interest and is the least onerous path that can be taken to achieve the State's

38

objective. *MEIC 1999*, ¶ 63. Thus, we must first decide whether the MEPA Limitation implicates the right to a clean and healthful environment and, if it does, whether the statute survives strict scrutiny.

¶58 Whether a statute implicates the right to a clean and healthful environment does not depend on whether a plaintiff demonstrates that public health is threatened or that current statutory standards are affected to such an extent that a significant impact has been shown on the environment. *MEIC 1999*, ¶¶ 77–78. We held in *MEIC 1999* that a statute violated the right to a clean and healthful environment when it arbitrarily excluded certain activities from nondegradation review without regard to the nature or volume of discharge. *MEIC 1999*, ¶ 80. Similarly, we held unconstitutional a law that removed equitable relief as a form of legal relief to a MEPA violation—akin "to a mandatory aircraft inspection after takeoff." *Park Cnty.*, ¶ 72.

¶59 MEPA requires environmental review prior to government actions that may significantly affect the human environment. *Park Cnty.*, ¶ 65 (citing § 75-1-201, MCA). In 2003, MEPA's purpose statement was amended to clarify that MEPA was enacted by the Legislature "mindful of its constitutional obligations under Article II, section 3 and Article IX of the Montana constitution," that MEPA is procedural, and that the purpose of environmental review is to ensure that "environmental attributes are fully considered." *Park Cnty.*, ¶ 66 (quoting § 75-1-102(1), MCA). In 2011, MEPA's policy statement was again amended "to clarify that the purpose of environmental review under MEPA is to better enable the Legislature 'to fulfill [its] constitutional obligations' and to 'assist the legislature in determining whether laws are adequate to address impacts to Montana's

environment and to inform the public and public officials of potential impacts resulting from decisions made by state agencies.'" *Park Cnty.*, ¶ 66 (quoting § 75-1-102(1), (3), MCA (2011)). Since its enactment, the Legislature has shaped MEPA as a vehicle for pursuing its constitutional mandate to prevent environmental harms and its forward-looking mechanisms are encompassed by the Legislature's constitutional obligations. *Park Cnty.*, ¶¶ 67–69. The 2011 amendments also added the first MEPA Limitation.

¶60 Although MEPA is essentially procedural, "'[p]rocedural' of course, does not mean 'unimportant.' The Montana Constitution guarantees that certain environmental harms shall be prevented, and prevention depends on forethought." *Park Cnty.*, ¶ 70. MEPA enables "fully informed and considered decision making, thereby minimizing the risk of irreversible mistakes depriving Montanans of a clean and healthful environment." *Park Cnty.*, ¶ 70. The ability to avert potential environmental harms through informed decision making makes MEPA unique among other environmental statutes—and complementary to, rather than duplicative of, them. *Park Cnty.*, ¶ 76.

¶61 The State argues that the MEPA Limitation does not implicate the right to a clean and healthful environment because under our precedent in *Bitterrooters for Planning, Inc. v. Montana Department of Environmental Quality*, 2017 MT 222, 388 Mont. 453, 401 P.3d 712, state agencies do not have authority to evaluate GHG emissions regardless. The State reads *Bitterrooters* too broadly. Bitterrooters challenged DEQ's failure to consider the secondary impacts that would result from constructing and operating a retail facility when

it issued a wastewater discharge permit for a separate, smaller wastewater processing facility. *Bitterrooters*, ¶¶ 12–13.

¶62 Under MEPA, agencies must "take a hard look" at environmental impacts of contemplated agency actions. *Bitterrooters*, ¶ 17. A more detailed evaluation is required of actions that will significantly affect the human environment compared to those that do not. *Park Cnty.*, ¶ 31 (citing *Bitterrooters*, ¶ 20). Environmental assessments must include an evaluation of cumulative and secondary impacts that have a "reasonably close causal relationship" between the triggering state action and the subject environmental effect, including "the collective impacts on the human environment of the proposed action when considered in conjunction with other past and present actions related to the proposed action by location or generic type" and "a further impact to the human environment that may be stimulated or induced by or otherwise result from a direct impact of the action."[10] *Park Cnty.*, ¶ 32; *Bitterrooters*, ¶¶ 21–22, 25, 33; Admin. R. M. 17.4.603(7), (18), 609(3)(d)–(e) (1989); *see also* Admin. R. M. 18.2.239(3)(d)–(e) (1988); Admin. R. M. 36.2.525(3)(d)–(e) (1988).

¶63 We held that the construction and operation of the separate retail store was not a secondary impact subject to MEPA review for the wastewater treatment system permit.

_____

[10] The Dissent imports *Bitterrooters'* causation requirement into its standing analysis. Dissent, ¶ 91. The State also asks us to import this requirement into our standing analysis. We decline to do so. *Bitterrooters* did not involve an issue of standing but instead discussed whether a party could challenge a permit under MEPA for failing to analyze the effects of an independent project from the permitted project. This case is not a challenge to an agency's environmental review under MEPA, § 75-1-201(5)(a)(i), MCA, but rather a facial constitutional challenge to a statute within MEPA.

*Bitterrooters*, ¶¶ 34–35. First, the retail store did not need a permit to proceed, except as required by general land use regulations issued by the local government, which DEQ had no authority under. *Bitterrooters*, ¶ 34. Additionally, the retail store was the cause-in-fact of the wastewater treatment facility; the wastewater treatment facility was not a cause-in-fact of the retail facility. *Bitterrooters*, ¶¶ 25, 35. Thus, even if the wastewater treatment facility was not permitted, the retail facility and any associated impacts would still occur. Obviously then, those impacts were not secondary to the wastewater treatment facility and DEQ did not need to conduct a MEPA analysis of impacts that would occur even without the permitted activity.

¶64 Here, the State's argument that GHG emissions do not have a "reasonably close causal relationship" to permitting a coal mine or an electrical generation plant—both of which need a permit under the Clean Air Act under the agreed facts in the District Court— is disingenuous at best. This argument is distinguishable from the facts in *Bitterrooters*, which contemplated that DEQ had no authority to permit a separate retail facility from the one being built to treat wastewater, which was subject to a completely different regulatory authority. In the permitting context discussed here by the State, there is no reasonable argument that GHG emissions are not a "direct and secondary environmental impact[] that will likely result from the specific activity conducted or permitted by the agency" within their authority in permitting these types of facilities. *Bitterrooters*, ¶ 34.

¶65 We have looked to federal authority construing related provisions of the National Environmental Policy Act (NEPA) that discuss cumulative and secondary impacts as persuasive. *Bitterrooters*, ¶ 18. Even post *Department of Transportation v. Public Citizen*,

541 U.S. 752, 124 S. Ct. 2204 (2004), which we based our decision in *Bitterrooters* on, Circuit Courts of Appeals routinely reject NEPA permits for failing to include analysis on the downstream effects of GHG emissions.  For example, the Ninth Circuit rejected a permit for a coal mine expansion as faulty for failing to include an analysis of cumulative impacts of GHG emissions from the eventual burning of coal that would be mined in the expanded permit area, even though that coal would be burned in other countries.  *See 350 Montana*, 50 F.4th at 1272; *see also, e.g.*, *Ctr. for Biological Diversity*, 538 F.3d at 1217 ("The impact of [GHG] emissions on climate change is precisely the kind of cumulative impacts analysis that NEPA requires agencies to conduct."); *Sierra Club v. FERC*, 867 F.3d 1357, 1374 (D.C.C. 2017) ("We conclude that the EIS for the Southeast Market Pipelines Project should have either given a quantitative estimate of the downstream greenhouse emissions that will result from burning the natural gas that the pipelines will transport or explained more specifically why it could not have done so.").  A blanket prohibition on GHG emissions review in all MEPA analyses clearly implicates the right to a clean and healthful environment and must be analyzed under strict scrutiny. *See also MEIC 1999*, ¶¶ 30–31, 77–79 (rejecting argument that strict scrutiny does not apply to projects that demonstrate no significant changes to pollutant levels).

¶66    The State argues that the total amount of Montana's permitted GHG emissions is insignificant when evaluated against the total amount of global GHG emissions.  But just because one permitted project may seem insignificant when compared to worldwide emissions from every source and every project, it does not mean the project's emissions will not "significantly affect the quality of the human environment," requiring an

43

environmental impact statement under MEPA, *see Park County*, ¶ 31, or result in an unconstitutional degradation to a clean and healthful environment. Mont. Const. art. II, § 3. This argument would be akin to DEQ arguing that, because 95% of selenium enters Lake Koocanusa from Canadian coal mines, dischargers in Montana should not be regulated for selenium pollution if they discharge comparatively smaller amounts, which is verifiably false. *See* Final Written Findings for the Site-Specific Water Column Selenium Standard for Lake Koocanusa, MT at 5, Dep't Env't Quality (June 2022) (available at https://deq.mt.gov/files/Water/WQPB/Standards/Koocanusa/Selenium_WrittenFindings_Final.pdf [https://perma.cc/QF4Y-YTDK]) (discussing that no current permittee will be impacted by the selenium rule because none have selenium in their discharges but, if future permittees do, they will be able to meet or exceed the standards with current best practices). Canadian coal mines causing water quality exceedances in Montana would not insulate a Montana-based mine or discharger from an appropriate MEPA review that included selenium as a factor. Similarly, global GHG emissions do not insulate the State from its affirmative constitutional duties with regards to projects that it permits. *Accord 350 Montana*, 50 F.4th 1254 (rejecting faulty environmental assessment of coal mine expansion for failing to consider emissions that would result from the combustion of the mined coal and for finding no significant impact when considering global emissions as a whole). The fact that climate change impacts extend beyond Montana's borders, as does selenium pollution and other environmental harms, does not allow the State to disregard its contributions to environmental degradation within Montana.

44

¶67 The State's circular argument fails: it acknowledges that "MEPA exists to inform the Legislature and the public about the environmental impacts of government actions," yet argues that it and the public need not be informed of the potentially catastrophic cumulative impacts from its actions. MEPA mandates that the State take a "hard look at the environmental consequences of its actions" before it leaps, which is impossible when the State intentionally refuses to consider an entire area of significant environmental consequences. *Ravalli Cnty. Fish & Game Ass'n v. Mont. Dep't of State Lands*, 273 Mont. 371, 381, 903 P.2d 1362, 1369 (1995). Obviously, a clean and healthful environment cannot occur unless the State and its agencies can make adequately informed decisions. *Park Cnty.*, ¶ 70; *accord Schoof*, ¶ 17. Nor can Plaintiffs be informed of anticipated impacts to the environment when the Legislature forecloses an entire area of review proven to be harmful to Montanans' right to a clean and healthful environment. Section 75-1-102(1)(b), MCA. Nor will the Legislature be informed of whether laws are adequate to address climate change when MEPA precludes an environmental review addressing the impacts from potential state actions. Section 75-1-102(3)(a), MCA.

¶68 The State says it has a compelling interest in balancing private property rights with the right to live in a clean and healthful environment. We need not discuss this because even if the State's asserted interest is compelling, the State does not overcome its burden to show that the MEPA Limitation was narrowly tailored to this interest. The State argues that because it did not amend any substantive regulatory statutes to prohibit regulations or permitting decisions based on GHG emissions, the MEPA Limitation was narrowly tailored. Regardless of other substantive permitting statutes, "MEPA is unique in its ability

45

to avert potential environmental harms through informed decision making." *Park Cnty.*, ¶¶ 75–76. Foreclosing environmental review of GHG emissions under MEPA prevents state agencies from using any information garnered during this process to inform and strengthen substantive permitting or regulatory decisions or any mutual mitigation measures or alternatives that might be considered when the environmental harms of the proposed project are fully understood. The MEPA Limitation arbitrarily excludes all activities from review of cumulative or secondary impacts from GHG emissions without regard to the nature or volume of the emissions absent a requirement by federal law. *Accord MEIC 1999*, ¶ 80. The MEPA Limitation thus violates those environmental rights guaranteed by Article II, Section 3, and Article IX, Section 1, of the Montana Constitution. The District Court is affirmed: section 75-1-201(2)(a), MCA, is unconstitutional and the State is permanently enjoined from acting in accordance with it. We decide only that the Constitution does not permit the Legislature to prohibit environmental reviews from evaluating GHG emissions. Other issues will be discussed in the context of specific permitting cases.[11] Our decision is limited to the constitutionality of § 75-1-201(2)(a), MCA.

¶69 The District Court also declared § 75-1-201(6)(a)(ii), MCA (2023), unconstitutional. This section purported to limit judicial remedies for MEPA challenges "based in whole or in part upon greenhouse gas emissions and impacts to the climate in Montana or beyond Montana's borders." Section 75-1-201(6)(a)(ii), MCA (2023).

---

[11] *E.g. Mont. Env't Info. Ctr. v. Mont. Dep't of Env't Quality*, No. DA 23-0225 (whether evaluating GHG emissions under MEPA review is required for natural gas electric generating facility).

*Accord Park Cnty.*, ¶¶ 55, 78, 88–89 (finding a law that precluded equitable remedies under MEPA unconstitutional). The State does not appeal that part of the Order and has thus conceded the law's unconstitutionality on appeal. *Barrett*, ¶ 42. Section 75-1-201(6)(a)(ii), MCA (2023), is unconstitutional and permanently enjoined.

¶70 *Issue Four: Whether the District Court abused its discretion by denying the State's motion for a psychiatric examination under Rule 35.*

¶71 Psychiatric examinations are "particularly invasive of an individual's right to privacy. It is an extraordinary form of discovery which is permitted under Rule 35 only when the plaintiff's mental condition is in controversy, and then only when good cause has been shown." *State ex rel. Mapes v. Dist. Court*, 250 Mont. 524, 532, 822 P.2d 91, 96 (1991).

¶72 The State sought an order in the District Court allowing it to conduct a psychological evaluation of eight plaintiffs, including interviews focused on their "psychological and behavioral history, alcohol and drug use, school performance, and exposure to trauma." The State argues that these eight plaintiffs put their mental health "in controversy" as required under Rule 35 because of its "concern that the issue of standing may turn on the question of psychological harm." We need not resolve this issue, as our standing analysis focused on Plaintiffs' injury to a constitutional right rather than to any mental, emotional, physical, aesthetic, or property interests harmed by the State's actions. The District Court also concluded Plaintiffs had standing even without considering their psychological harms. Additionally, we note that the State only wanted to examine eight of the plaintiffs. Even absent those eight plaintiffs, the District Court concluded other plaintiffs had standing to

challenge the MEPA Limitation. One plaintiff with standing is sufficient. *Aspen Trails Ranch*, ¶ 45. The State has failed to show the District Court abused its discretion in finding no good cause to order the Rule 35 examinations.

## CONCLUSION

¶73 Plaintiffs have standing to challenge the injury to their constitutional right to a clean and healthful environment. Montanans' right to a clean and healthful environment was violated by the MEPA Limitation, which precluded an analysis of GHG emissions in environmental assessments and environmental impact statements during MEPA review. The MEPA Limitation, § 75-1-201(2)(a), MCA, is unconstitutional and the State is enjoined from acting in accordance with it. Additionally, the State did not appeal the District Court's finding that § 75-1-201(6)(a)(ii), MCA (2023), is unconstitutional and its order enjoining the State from acting in accordance with it and it is thus affirmed.

¶74 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ INGRID GUSTAFSON
/S/ LAURIE McKINNON

48

Justice Dirk Sandefur, concurring.

¶75 For the following reasons only, I concur at bottom with the Court's ultimate issue holdings in this case.

¶76 I first concur with the Majority on the easy question of whether Mont. Const. art. II, § 3 (right to "clean and healthful environment"), generically includes the right to a stable climate system that sustains human lives and liberties. However, the harder and more complex question unaddressed by the Majority, and the conspicuously absent *particularized* causation evidence in this case, is how that fundamental Montana constitutional right possibly can or should apply to restrictive MDEQ MEPA-compliance review of the gubernatorial energy policies originally at issue below, not to mention particular projects that otherwise comply with all applicable air quality review and permitting standards and requirements of the controlling federal Clean Air Act and subordinate Montana Air Quality Act regulatory scheme, in the face of the very real and uniquely complex global warming problem plaguing the entire planet, not just the slice of sky over Montana.

¶77 In regard to the indiscriminately universal global warming problem, it is undisputed and indisputable that even the complete elimination of all fossil fuel related human activities in the State of Montana will not, and simply cannot, appreciably mitigate or reduce the only generalized injuries claimed by Plaintiffs, and which are common to all Montanans and inhabitants of planet Earth, as consequences of global warming. To that point, the undisputed, but inconvenient, record facts in this case are:

49

(1)     atmospheric carbon dioxide ($CO_2$) loading resulting from fossil fuel burning is the most significant source of the human-caused greenhouse gas (GHG) emissions attributed by scientists as the most significant cause of the accelerated global warming currently occurring on this planet;

(2)     as of 2019, however, fossil fuel related human activities in Montana contributed only "about 32 million tons" of additional atmospheric $CO_2$ emissions into the global climate system;

(3)     the 32 million tons of annual atmospheric $CO_2$ loading attributable to fossil fuel related human activities in Montana is less than 1% of the total annual worldwide atmospheric $CO_2$ loading; and thus

(4)     even complete elimination of the total annual atmospheric $CO_2$ loading attributable to fossil fuel related human activities in Montana will not and simply cannot appreciably mitigate or reduce, much less avoid, the only generalized injuries experienced by Plaintiffs as a consequence of global warming.

The overly simplistic focus of Plaintiffs and the Majority of this Court on the undisputed and indisputable fact that global warming "is harming Montana's environmental life support system now and with increasing severity for the foreseeable future" is no more than a political and public policy statement of the obvious. As such, it further serves as a smokescreen diverting attention away from those inconvenient facts of record and the other similarly indisputable fact: accelerated global warming caused by fossil fuel burning and other human sources of greenhouse gases is a highly complex global problem, any solution or meaningful mitigation to or of which lies exclusively in the domain of federal and international public policy choices and cooperation, rather than in a flashy headline-grabbing rights-based legal case in Montana.

¶78    Second, I generally agree with the State that the complete lack of *particularized* causation evidence in this case calls into serious question the threshold jurisprudential

50

standing of the Plaintiffs to assert the broad-scope legal claims for relief asserted and litigated in the district court below. I further disagree with and reject the Majority's strained and thinly-veiled attempt to distinguish the pertinent principle recognized in *Bitterrooters for Planning, Inc. v. Mont. Dep't of Env't Quality*, 2017 MT 222, 388 Mont. 453, 401 P.3d 712 (holding in pertinent essence that MEPA did not require MDEQ review of adverse environmental impacts resulting from causes-in-fact beyond the authority of MDEQ to regulate under existing state or federal and environmental protection laws), based on patently inaccurate or inconsequential distinctions. However, I nonetheless agree with the Majority at bottom that Plaintiffs had minimally sufficient standing under our liberal jurisprudential standing requirements to assert the claims at issue, and that the recent legislative attempts at issue to pare-back the generally required scope of MEPA review are unconstitutional in violation of the Mont. Const. art. II, § 3, right to a "clean and healthful environment."

¶79 I finally wholeheartedly concur with the Majority holding that the District Court did *not* abuse its discretion in denying the State's patently ridiculous and overly-intrusive request for court-ordered psychological evaluations of a selected eight Plaintiffs in this case. For the foregoing reasons only, I thus concur at bottom with the Court's ultimate issue holdings in this case.

/S/ DIRK M. SANDEFUR

51

Justice Jim Rice, dissenting.

¶80     Cumulative studies now indicate that the climate of vast areas is warming rapidly . . . . Though these new developments provide evidence of intensified interest in long-term climate trends, and will undoubtedly prove of great value, we already know that the earth is warming, and swiftly . . . . One thing is certain.  This is more than a brief, superficial change . . . with a multitudinous variety of clues:  the migration of flora and fauna, the melting of the world's ice, changes in oceanic and atmospheric conditions and temperatures, barometric pressures, rainfall and diminishing salinity of the seas . . . .  Climatologists estimate that a three-degree rise in the planet's average mean annual temperature would be sufficient to melt all accumulated ice within a relatively short span of years and prevent winter ice that formed thereafter from remaining throughout the summers . . . .  Some scientists calculate that melting of all the planet's ice would raise the oceans no more than ninety feet; others assert the rise would be in the neighborhood of 500 feet.  In either event, all present seaports would be seriously affected while the majority would be completely inundated . . . .

        In the last generation, changes that have had a decisive influence on all social life have occurred . . . .  A new era has begun.

Scientists have discovered and demonstrated that the earth's climate is changing, and that it is doing so at an increasing pace, bringing about significant and potentially catastrophic environmental and social consequences.  Climate change, and the potential impacts upon the lives of the people of the world, were alertly raised and discussed in detail in the above-quoted article, published by the ubiquitous mainstream Saturday Evening Post, *in 1950*. *See* Albert Abarbanel & Thorp McClusky, *Is the World Getting Warmer?*, The Saturday Evening Post, July 1, 1950, at 22; *see also Earliest Coverage of Climate Change*, The Saturday Evening Post, September/October 2021, at 58 ("Decades before the warming of the planet became headline news—and a political hot button," the Post's 1950 report was one of the first to "warn of rising sea levels, melting glaciers, and shifting agricultural

52

zones"). Along with the rising sea levels, concern has likewise heightened in the succeeding 74 years since the Post's reporting about the issue.

¶81    Even so, this growing urgency affords no discretion or authority for the Court to excuse the constitutional requirement that Plaintiffs bring a concrete case or controversy before the Court—a case or controversy that must be defined by constitutional principles governing justiciability and standing, not by policy significance or vogue. These other measures may well move the executive and legislative branches to action, but they are not permitted to so compel the judicial branch. Failure to enforce constitutional case or controversy requirements inevitably turns a court into an *ad hoc* legislative body. Without a doubt, the debate about climate change, and related topics such as possible geoengineering solutions—from the enormous carbon dioxide vacuum facility in Hellisheidi, Iceland, to the massive direct carbon dioxide air-capture facility in Odessa, Texas, to stratospheric aerosol injection technology designed to deflect more and capture less sunlight and thus cool the earth, to enhancement of the capability of the oceans' phytoplankton habitat to draw and absorb carbon dioxide—are both fascinating and controversial, but courts must nonetheless resist the temptation to depart from their lane, and refrain from entering these matters except upon clear demonstration of a justiciable case or controversy as required by the constitution.[1]

---

[1] *See* David Gelles, *The New Climate Tech*, N.Y. Times (April 1, 2024), https://www.nytimes.com/2024/04/01/briefing/climate-technology-carbon-capture.html [https://perma.cc/8RYG-SJA9].

¶82   That does not exist here. The Court emphasizes the breadth of the Constitution's environmental protections, but that, of itself, does not create a case or controversy. Many constitutional provisions are considered to be "broad." All of the environmental cases relied upon by the Court involved a government action that operated upon, and thus directly impacted, the subject plaintiffs, who brought an action in each of those cases to challenge the particular government action affecting them. Here, as further analyzed below, there is no such operative government action—no project, no application, no decision, no permit, no enforcement of a statute—which directly impacted the Plaintiffs. Rather, the only government action raised here is an enactment of a statute that *could* operate to affect Plaintiffs if applied in an actual case. The District Court struck down these statutes as unconstitutional, even though the statutes had never operated upon the Plaintiffs, and then struggled to define what this result meant, because there was no actual pending dispute to which its ruling could attach. Consequently, instead of a "decree of conclusive character," *Broad Reach*, ¶ 10 (citing *Chovanak v. Matthews*, 120 Mont. 520, 526, 188 P.2d 582, 585 (1948)), the District Court entered a floating judgment of generic unconstitutionality.

¶83   As much as we want to encourage young people to involve themselves in the political process, that desire itself cannot turn Plaintiffs' compelling stories into constitutional standing. That is because Plaintiffs' stories are not legally unique. Like-compelling stories could also be drawn from the more than one million other Montanans who are likewise affected by climate change—about how climate change has impacted them, affected their wellbeing, and created fear and concern about their future. Indeed, it is not only young people who have been impacted by climate change and are very

54

concerned about it. "In the last generation, [climate] changes that have had a decisive influence on all social life have occurred"—was a description of the impact of climate change upon the generation that also endured the Great Depression and fought World War II. *Is the World Getting Warmer?*, *supra*, at 23. Climate change is universal in effect and nondiscriminatory; it affects everyone. And even if it has affected some persons more than others, that impact does not erase the population-wide effect of climate change. Because there is nothing about Plaintiffs' stories that could not also be found within the collective experience of the entire Montana population, their allegations are not distinguishable from the general public at large, and thus erode a claim to standing. What is necessary for standing is a Montana government action that has directly impacted a member of the Montana population, which is absent here. As explained more specifically herein, the Court's ruling opens the courts for litigants, upon a hypothetical set of facts, to seek and obtain redress from courts by advisory opinions. I thus turn to the governing constitutional principles.

¶84 Justiciability is a threshold issue that must be met for the Court to exercise jurisdiction over a claim and in turn adjudicate a dispute. *Broad Reach*, ¶ 10 (citing *State v. Whalen*, 2013 MT 26, ¶ 40, 368 Mont. 354, 295 P.3d 1055). "The purpose of an action under the Uniform Declaratory Judgments Act (UDJA or Act) is 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.' Section 27-8-102, MCA. Any interested party may seek a declaratory judgment to determine questions about their rights, status, or other relations regarding their interests. Section 27-8-202, MCA. While the UDJA is construed liberally to effectuate these

purposes, the Act's use is 'tempered by the necessity that a *justiciable controversy* exist before courts exercise jurisdiction.'" *Broad Reach*, ¶ 9 (emphasis in original) (citing *Northfield Ins. Co. v. Mont. Ass'n of Cntys.*, 2000 MT 256, ¶ 10, 301 Mont. 472, 10 P.3d 813). "Courts do not function, even under the Declaratory Judgments Act, to determine speculative matters, to enter anticipatory judgments, to declare social status, to give advisory opinions or to give abstract opinions." *Donaldson v. State*, 2012 MT 288, ¶ 9, 367 Mont. 228, 292 P.3d 364.

¶85    There are two recognized parts to standing:  the constitutionally imposed case or controversy requirement, as well as other judicially imposed prudential limitations. *Heffernan*, ¶ 31.  When case or controversy standing is at issue, the question is whether the complaining party is the proper party before the court, not whether the issue itself is justiciable. *See Bullock v. Fox*, 2019 MT 50, ¶ 31, 395 Mont. 35, 435 P.3d 1187. "To have case-or-controversy standing, 'the complaining party must clearly allege past, present, or threatened injury to a property or civil right.'" *Bullock*, ¶ 31 (citing *Mont. Immigrant Justice All. v. Bullock*, 2016 MT 104, ¶ 19, 383 Mont. 318, 371 P.3d 430). "The alleged injury must be: *concrete*, meaning actual or imminent, and *not abstract, conjectural, or hypothetical*; *redressable*; and *distinguishable from injury to the public generally*." *Bullock* ¶ 31 (emphasis added); *see also Broad Reach*, ¶ 10 (explaining that a controversy must be "definite and concrete such that it touch[es] legal relations of parties having adverse legal interests and be a real and substantial controversy that enables relief through [a] decree of conclusive character" and be "distinguishable from an opinion advising what the law would be upon a hypothetical state of facts or upon an abstract proposition.")

56

(internal citations omitted; internal quotations omitted). We have analogized to federal jurisprudence regarding constitutional standing, explaining that "'the irreducible constitutional minimum of standing' has three elements: injury in fact (a concrete harm that is actual or imminent, not conjectural or hypothetical), causation (a fairly traceable connection between the injury and the conduct complained of), and redressability (a likelihood that the requested relief will redress the alleged injury)." *Heffernan*, ¶ 32 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 2136 (1992)). We thus explained that the claimed injury "must be one that would be alleviated by successfully maintaining the action." *Heffernan*, ¶ 33. In my view, the Court's analysis of injury related to causation and redressability is incorrect. Although Plaintiffs have indeed alleged an injury, it is critical to correctly understand what that injury is. When the injury is correctly defined, it is clear that the primary statute at issue, § 75-1-201(2)(a), MCA, or the "MEPA Limitation," *alone* cannot be said to have caused the injury to Plaintiffs within this case, nor does judicial voiding of the MEPA Limitation provide redress of the injury alleged by Plaintiffs. Thus, they do not have individual standing to bring the action.

*I. Injury*

¶86 The Court relies on *Schoof*, and *MEIC 1999* to reason that Plaintiffs' contention that "climate change is causing serious and irreversible harms to the environment in Montana— assuring them and future Montanans a 'harmful' rather than 'healthful' environment" is itself "a sufficient personal stake" to establish standing to bring their constitutional claims against the MEPA Limitation. Opinion, ¶ 36. Thus, the Court now grants standing to a citizen to bring a challenge to a statute as violative of the Constitution's environmental

57

provisions upon the mere assertion that the statute fails to protect the citizen against environmental harm, to be followed by an opportunity to prove a case at trial, despite the fact that the selected statute was never applied to the citizen by any government action. Neither *Schoof* nor *MEIC 1999* supports this proposition.

¶87    The Court applies *Schoof* beyond the parameters of its holding. Critically, *Schoof* addressed our precedent's failure to recognize the unique "nature of the 'injury' at issue *in a right to know or right of participation case*," and held that requiring a right to participate plaintiff to allege an injury under the usual "standing thresholds," such as a personal stake in the loss of the participation right, was "incompatible with the nature of *the particular constitutional rights at issue*." *Schoof*, ¶ 17 (emphasis added). "Under the plain language of Article II, Sections 8 and 9, and the implementing statutes, the personal stake that Schoof has here is the reasonable 'opportunity' to observe and participate in the Commissioners' decision-making process, including submission of information or opinions. To vindicate these rights Schoof should not be required to demonstrate a personal stake . . . or an 'injury' *beyond being deprived of adequate notice* of the Commissioners' proposed action and the corresponding opportunity to observe and participate as a citizen in the process." *Schoof*, ¶ 19 (emphasis added). Consequently, we held that "a citizen *in Schoof's position*"—a citizen who had been deprived of notice of the meeting and who desired to attend—had a personal stake and thus standing to allege a violation of the right to know and the right to participate. *Schoof*, ¶ 25 (emphasis added). Schoof had established an injury for which he sought, and could obtain, redress from the judiciary: he had been deprived of the right to

participate in a meeting and requested—in *that* case, for *that* meeting—to be granted the opportunity to do so.

¶88 However, the Court's attempt—indeed, the analytical lynchpin of its Opinion, *see* Opinion, ¶ 51—to overlay *Schoof's* right to know and right of participation standing analysis upon constitutional challenges brought under the environmental provisions clearly does not fit, as environmental cases neither present the same injury nor the same standing issues that necessitated the holding in *Schoof*. *See* Opinion, ¶ 40 ("Like Schoof, Plaintiffs have shown a sufficiently concrete injury . . . ."). While I agree the clean and healthful provision is an expansive right that is intended to apply to every citizen of Montana, Opinion, ¶ 40, it does not follow that *any* impact, current or imminent, upon a clean and healthful environment allegedly allowed by a statute alone constitutes a sufficiently concrete injury to every citizen for standing purposes, such that an action can be brought without demonstration of a personal stake in the litigation—that is, the government's application of the statute in a controversy affecting the citizen. In *Schoof*, the alleged constitutional right to know violation was triggered by the mere lack of notice of government action; here, notice is not the issue, and a real injury is required.

¶89 The Court's analysis seemingly conflates injury with causation and redressability, reasoning that a *Schoof* constitutional violation is present here because "the MEPA Limitation prevents the state from considering GHG emissions in all projects that may have an impact on the Montana human environment." Opinion, ¶ 40. However, standing requires that the MEPA Limitation be a *cause* of the *injury*, which is the degradation of a clean and healthful environment. An alleged injury cannot be a theoretical observation that

59

the challenged MEPA framework is insufficient; rather, for standing purposes, a concrete current or impending violation of the constitutional right to a clean and healthful environment—the injury—by way of the government's application of the framework to the Plaintiffs—the cause—is required.

¶90 The Court's reliance on *MEIC 1999* illustrates this principle. There, plaintiffs challenged "the exploration license that had been issued by DEQ to [the mining company] for pump tests to be performed at the site of its proposed gold mine," which the uncontroverted allegations of their complaint demonstrated an "arguably adverse impact on the area in the headwaters of the Blackfoot River in which they fish and otherwise recreate, and which is a source for the water which many of them consume." *MEIC 1999*, ¶¶ 1, 45. Plaintiffs alleged that, to the extent that § 75-5-317(2)(j), MCA, allowed discharges of water from watering wells or monitoring well tests that could degrade high quality waters without sufficient review under Montana's non-degradation policy, the statute violated the Montana Constitution. Thus, the plaintiffs there, who alleged that the government's action of issuing a permit pursuant to the statute would imminently cause harm to them personally, had standing to bring the action under the environmental provisions that the Court described as "anticipatory and preventative." *See MEIC 1999*, ¶¶ 45, 77. The injury for standing purposes was the threatened degradation of a clean and healthful environment, and our analysis considered whether the challenged statute was a cause of that injury by way of the government's application of the statute in issuing an exploration permit which authorized *conduct* that would imminently damage the plaintiffs. *See MEIC 1999*, ¶ 80. Here, in contrast, the government has not issued a permit or taken

60

other action that applied the MEPA Limitation such that conduct directly affecting the Plaintiffs has been authorized; rather, only a theoretical damage is alleged. Under the lawsuit as brought, the correct standing analysis must ask whether the challenged statute, the MEPA Limitation, *solely* has caused the alleged degradation of a clean and healthful environment. I believe that contention to be insufficient to satisfy constitutional case or controversy requirements, which is furthered by a demonstration that a repeal of the MEPA Limitation alone could not redress the Plaintiffs' claimed injury.

## II. Causation & Redressability

¶91 Causation for constitutional standing purposes is established by "a fairly traceable connection between the *injury* and the *conduct* complained of." *Heffernan*, ¶ 32 (emphasis added); *see also 350 Mont. v. State*, 2023 MT 87, ¶ 15, 412 Mont. 273, 529 P.3d 847 ("[A] general or abstract interest in the constitutionality of a statute . . . is insufficient for standing absent a direct causal connection between the alleged illegality and specific and definite harm personally suffered, or likely to be personally suffered by the plaintiff."). And, relevant here in a challenge to the MEPA Limitation, for purposes of the permissible scope of a MEPA review, MEPA "requires a reasonably close causal relationship between the triggering state action and the subject environmental effect." *Bitterrooters*, ¶ 33.

¶92 As discussed above, in *MEIC 1999*, the non-degradation review statute challenged by plaintiffs was connected to the injury because a mineral exploration license (the conduct) allowing discharge containing arsenic and zinc was authorized by the government pursuant to the statute. *MEIC 1999*, ¶ 50. Likewise, in *Schoof*, the closed-door meeting

without prior notice directly caused the plaintiff to be deprived of the right to know and participate in the decision made by the County Commission. *Schoof*, ¶ 21.

¶93 In *Larson*, the Montana Democratic Party challenged the validity of a Green Party ballot eligibility petition for an upcoming election. Addressing standing, we found "a direct causal connection in fact between the alleged illegality and definite, specific, and substantial resulting harm to the Democratic Party itself," given that failure to address the challenge to the ballot petition would "in fact cause the Montana Democratic Party to incur otherwise unnecessary expense and burden in the form of: (1) additional campaign expenditures; (2) revision of its voter file; (3) undertaking additional fundraising efforts; (4) procuring and deploying additional staff, volunteers, and literature; and (5) conducting more expensive and complicated political polling." *Larson*, ¶ 47. And, addressing redressability, we said that "[t]he alleged harm was clearly of a type effectively diminished, curable, or preventable by the available and requested declaratory and injunctive relief." *Larson*, ¶ 47.

¶94 In *Park Cnty.*, we reiterated that plaintiffs must "clearly allege a past, present, or threatened injury" that must be "distinguishable from the injury to the public generally," which can be "alleviated by successfully maintaining the action." *Park Cnty.*, ¶ 20 (citing *Heffernan*, ¶ 33). The Court determined that the plaintiffs had standing because they alleged recreational, property-based, and aesthetic injuries that were "the *direct result* of DEQ's approval of Lucky's exploration permit and could be alleviated by a successful action resulting in an order vacating the permit." *Park Cnty.*, ¶ 22 (emphasis added).

62

¶95 The Court's constitutional standing analysis in all previous cases has connected the plaintiffs' personal harm to the government's action in a specific case, for which a judicial holding could meaningfully attach to provide redress by barring or limiting the government action. Here, neither the Plaintiffs nor the Court connects the MEPA Limitation to any government action currently directly harming or threatening to directly harm Plaintiffs, and instead offer only a theory that harm is being caused to them because of a statute, and that, if the statute were now voided, the personal harm they have suffered would be eliminated— an assertion requiring multiple speculative causal steps that fail to "clearly allege" a personal injury that is "distinguishable from the injury to the public generally," and which can be "alleviated by successfully maintaining the action." *Park Cnty.*, ¶ 20 (citing *Heffernan*, ¶ 33); *see also 350 Mont.*, ¶ 15 ("[A] general or abstract interest in the constitutionality of a statute . . . is insufficient for standing absent a direct causal connection between the alleged illegality and specific and definite harm personally suffered, or likely to be personally suffered by the plaintiff."). This is injury and redress in an essential vacuum.

¶96 The Court reasons, "[Plaintiffs] showed that the State's policies, including the MEPA Limitation . . . impacts their right by prohibiting an analysis of GHG emissions, which blindfolded the State, its agencies, the public, and permittees when an analysis is necessary to inform the State's affirmative duty to take active steps to realize the right to a clean and healthful environment." Opinion, ¶ 44. Further, "MEPA enables 'fully informed and considered decision making thereby minimizing the risk of irreversible mistakes depriving Montanans of a clean and healthful environment.'" Opinion, ¶ 60. "MEPA is

63

unique in its ability to avert potential harms through informed decision making." Opinion ¶ 68 (citing *Park Cnty.*, ¶¶ 75–76). "Plaintiffs have a personal stake in being fully informed of the anticipated impacts of potential state action." Opinion, ¶ 37. These statements illustrate the disconnected causation: "the MEPA Limitation impacts . . . by prohibiting an analysis . . . which blindfolded . . . when an analysis is necessary . . . to inform . . . the duty to take active steps . . . to realize the right." The MEPA Limitation is thus offered, stated above, as determining "when analysis is necessary," to minimize "irreversible mistakes," to inform "decision making," and for Plaintiffs to be informed of "potential state action." All of these statements describe a broad process to guide *potential future* government actions, and do not identify any action, imminent or proposed, that has ever been taken by the government that directly impacted Plaintiffs. Further, by MEPA's own terms, an agency "may not withhold, deny, or impose conditions on any permit or other authority to act based on parts 1 through 3 of this chapter." Section 75-1-201(4)(a), MCA. We held in *Bitterrooters*, from which the Court must now retreat, that "requiring a state agency to consider environmental impacts it has no authority to lawfully prevent *would not serve MEPA's purposes* of ensuring that agencies and the interested public have sufficient information regarding relevant environmental impacts to inform the lawful exercise of agency authority." *Bitterrooters*, ¶ 33 (emphasis added). Consequently, by its own terms, MEPA *alone* cannot have caused the Plaintiffs' alleged injury, and further because it does not govern the substantive requirements of a final government action or decision, its voiding alone will not redress Plaintiffs' asserted injury.

¶97    In an effort to establish application of the MEPA Limitation to them, Plaintiffs point to permits issued in prior MEPA cases. Plaintiffs were not parties in those cases, and do not challenge them or the review processes undertaken therein, which would be required to establish standing in those matters. But more, we rejected a similar argument in *Broad Reach*. There, Broad Reach, LLC, and NorthWestern Energy brought an action seeking a declaration that a procedural statute governing contested case procedures before the Public Service Commission was unconstitutional because it violated their "due process right to a fair and impartial tribunal and a fair hearing." *Broad Reach*, ¶ 3. We held that the Plaintiffs failed to establish standing for a constitutional challenge because they brought their challenge "in a vacuum." *Broad Reach*, ¶ 13. Plaintiffs cited to the PSC's application of the statute in other hearing cases, but we held "these do not establish application of the statute by the PSC to [Plaintiffs] and, further, the contents of the orders primarily indicate the PSC 'may' employ certain hearing actions pursuant to the statute. This does not establish how the PSC acted with regard to [Plaintiffs], and to what prejudice." *Broad Reach*, ¶ 13. We thus rejected plaintiffs' attempt to bring an as-applied challenge without a case record, because entering declaratory relief on the statute would be "speculative, and would require issuance of an advisory opinion" entered upon "a hypothetical state of facts." *Broad Reach*, ¶ 13 (citing *In re Big Foot Dumpsters & Containers, LLC*, 2022 MT 67, ¶ 13, 408 Mont. 187, 507 P.3d 169). Such a hypothetical case vacuum also exists here. The Court holds that when a permit is sought for a project that would emit GHGs, the MEPA Limitation violates the Plaintiffs' constitutional rights. However, such circumstances have plainly never occurred in this case.

¶98 The Court reasons that accepting the State's standing argument "would effectively immunize" the constitutional issue here, but does so with a *non sequitur*. Opinion, ¶ 53.[2] Noting the State "makes the same standing arguments in a case challenging the constitutionality of the 2011 MEPA Limitation as applied to a particular permit," the Court states that "accepting the State's arguments in both cases would effectively immunize review of an important constitutional question." Opinion, ¶ 53, citing *Mont. Env't Info. Ctr. v. Mont. Dept. of Env't Qual*, No. DA 23-0225. However, it simply does not follow that, if the State is correct here, it must also be correct there—it is certainly not unique for a party to make inconsistent arguments, even within a case, let alone over separate cases. And, of course, the Court is not required to accept a party's arguments made in separate cases. Indeed, if the State's standing argument is correct here, but wrong in DA 23-0225, then the constitutional question may well be preserved in that case by way of an actual case or controversy. But, in any event, another case does not control here, and the issue is not immunized from review.

¶99 In *Sagoonick v. State*, 503 P.3d 777 (Alaska 2022), the Supreme Court of Alaska was presented with a like challenge rooted in climate change, with "young Alaskans" alleging that State's policies and actions violated both the Alaska Constitution's natural

---

[2] The Court frames this issue by stating, "[w]e note that at oral argument, counsel for the State stressed that there was no specific permit challenged below and that, if there were, Plaintiffs might have standing. Yet the State as intervenor makes the same standing arguments in a case challenging the constitutionality of the 2011 MEPA Limitation as applied to a particular permit." Opinion, ¶ 53. The State may well be right; had the Plaintiffs challenged a government action specific to them in this case, they could have established constitutional standing under our precedent.

resource provisions and their individual rights. *Sagoonick*, 503 P.3d at 782. The plaintiffs there broadly "sought a declaratory judgment stating that: (1) plaintiffs have 'fundamental and inalienable constitutional rights . . . including the right to a stable climate system that sustains human life and liberty'; (2) the State has a public trust duty to protect Alaska's natural resources; (3) the State has violated plaintiffs' various constitutional rights by exacerbating climate change through its statutory energy policy; (4) the State has put plaintiffs in danger by not reducing Alaska's carbon emissions; (5) the State has discriminated against plaintiffs as members of a protected age-based class through its statutory energy policy; and (6) the State has violated its public trust duty to protect Alaska's natural resources." *Sagoonick*, 503 P.3d at 799. They also sought injunctive relief. Despite recognizing "that article VIII [environmental provision] is not a complete delegation of power to the legislature," the Court nonetheless reasoned:

> Plaintiffs essentially seek to impose *ad hoc judicial natural resources management based on case-by-case adjudications of individual fundamental rights*. Judges would be deciding the extent of individual Alaskans' constitutional right to some level of development or conservation under article VIII based on those individual Alaskans' arguments about what would provide them "a natural right to life, liberty, the pursuit of happiness, and the enjoyment of the rewards of their own industry" under article I. But the Constitution expressly delegated to the legislature the duty to balance competing priorities for the collective benefit of all Alaskans. It thus is impossible to grant plaintiffs' requested injunctive relief without also infringing on an area constitutionally committed to the legislature, abandoning our "hard look" standard of review for natural resource decisions, and disrespecting our coordinate branches of government by supplanting their policy judgments with our own normative musings about the proper balance of development, management, conservation, and environmental protection.

*Sagoonick*, 503 P.3d at 796 (emphasis added).  While the District Court here similarly dismissed some of the relief sought by Plaintiffs, the claim that remains likewise opens the door for "ad hoc judicial natural resources management" by this Court.  *Sagoonick*, 503 P.3d at 796.[3]  The Alaska Supreme Court also reasoned that Plaintiffs' requested declaratory relief was not an obtainable remedy because it "would not compel the State to take any particular action," and would not "protect the plaintiffs from the injuries they allege." *Sagoonick*, 503 P.3d at 801.  Similarly here, and for the reasons discussed above, declaring the MEPA Limitation to be a generic violation of the right to a clean and healthful environment, and enjoining the State from applying it would not attach to any action taken here by the State, or compel the State to take any particular action, and would not alone protect the Plaintiffs from the injuries they allege.

¶100   This is well illustrated by a recent youth-plaintiff Ontario climate case.  In *Mathur v. Ontario*, 2024 ONCA 762, young Canadians have brought a "second generation" climate case against the government, alleging that the government's plan to address climate change, the 2016 Climate Change Mitigation and Low-carbon Economy Act, which Ontario adopted statutorily but voluntarily, provides insufficient standards and requirements to protect the environment and plaintiffs' constitutional rights.  *See Mathur v. Ontario*, 2024 ONCA 762.  Under the Court's decision today, such future second or third

---

[3] As noted by the Court, the District Court ruled that the political question doctrine precluded injunctive relief of "an order requiring the State to develop a remedial plan to reduce GHG emissions and to submit the plan to the court; [] an order for a special master to be appointed to review the remedial plan; and [] an order retaining jurisdiction until the State has fully complied with the plan."  Opinion, ¶ 7.

or fourth generation lawsuits, challenging any future action or statute adopted by the State as insufficient, could be brought in Montana courts without those plans ever having been applied to the plaintiffs. The Court's thumps up or thumbs down decisions in response to such lawsuits will truly allow the Court to act as an *ad hoc* legislative body for policy ideas never directly applied in a concrete way to the litigants—the consequence about which *Sagoonick* warned.

¶101 These concerns lead to broader justiciability issues, which go beyond the constitutional standing requirements discussed herein, and can be considered prudential standing issues. This elephant in the room should be noted. "Although the plaintiffs' invitation to get the ball rolling by simply ordering the promulgation of a [climate] plan is beguiling, it ignores that an Article III court will thereafter be required *to determine whether the plan is sufficient* to remediate the claimed constitutional violation of the plaintiffs' right to a 'climate system capable of sustaining human life.' We doubt that any such plan can be supervised or enforced by an Article III court." *Juliana*, 947 F.3d at 1173 (emphasis added). "[S]eparation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts." *Juliana*, 947 F.3d at 1172 (citing *Lujan*, 504 U.S. at 559–60). Separation of powers requires that policy changes be decided by the legislative and executive branches. "[I]nevitably, this kind of plan will demand action not only by the Executive, but also by Congress. Absent court intervention, the political branches might conclude—however inappropriately in the plaintiffs' view—that economic or defense considerations called for continuation of the very programs challenged in this suit, or a less robust approach to addressing climate

change than the plaintiffs believe is necessary." *Juliana,* 947 F.3d at 1172. While the Montana Constitution contains environmental provisions that must be enforced, there are other, sometimes competing, constitutional provisions to also be enforced—akin to the competing "economic and defense considerations" described in *Juliana*—and the policies enacted to balance these constitutional interests must ultimately be formulated by the executive and legislative branches, not the judicial branch, "however inappropriately in the plaintiffs' view." *Juliana*, 947 F.3d at 1172.

¶102 In sum, I would decide this case on the constitutional standing principles articulated herein. Plaintiffs here present us with an abstract injury that is indistinguishable from that to the public as a whole and is not legally concrete to them personally. Even if the injury would be found to be sufficient, the case is presented in a vacuum whereby the provision challenged, the MEPA Limitation, has not been shown to cause the specific constitutional harm alleged, and therefore, the Court's holding does nothing to redress the Plaintiffs' injuries. They thus lack standing.

¶103 I would reverse.

/S/ JIM RICE